UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:  1:11-cv-23820-O'SULLIVAN

[CONSENT CASE]

BANNING LARY, M.D. and KATHERINE
LARY, TODD LARY, AND SCOTT LARY
as Successor Trustees of the STARBRIGHT
GRANTOR FAMILY TRUST,

        Plaintiffs,

vs.

BOSTON SCIENTIFIC CORPORATION, a
Delaware corporation, and BOSTON
SCIENTIFIC SCIMED, INC., a Minnesota
corporation,
        Defendants.

                              /

## ORDER

THIS MATTER is before the Court on the Plaintiffs' Motion for Partial Summary

Judgment on Count IV of Second Amended Complaint and Memorandum of Law (DE#

164, 6/5/13) and Boston Scientific's Motion for Partial Summary Judgment with

Incorporated Memorandum of Law (DE# 171, 6/6/13)(filed under seal).  This case was

referred to the undersigned by the Honorable Joan A. Lenard for all further proceedings

including trial and entry of final judgment pursuant to the parties' consent.  (DE# 262,

10/7/13).  Having carefully reviewed the motions, responses, replies, statements of

material facts in support and in opposition to the motions, as well as evidence in the

record, and having held a hearing and heard argument, it is

ORDERED AND ADJUDGED that the Plaintiffs' Motion for Partial Summary

Judgment on Count IV of Second Amended Complaint and Memorandum of Law (DE#

1

164, 6/5/13) is GRANTED.  It is further

ORDERED AND ADJUDGED that Boston Scientific's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (DE# 171, 6/6/13)(filed under seal) is GRANTED in part and DENIED in part.  The defendants Boston Scientific Corporation and Boston Scientific Scimed, Inc. will be collectively referred to as "BSC." BSC's motion is granted as to Count I, denied as to Count IV, and denied as moot as to Count V.

## **BACKGROUND**

On June 27, 1991, the plaintiff Banning Lary ("Dr. Lary") and InterVentional Technologies, Inc. ("IVT") entered into the Technology Transfer Agreement ("TTA") to license his existing and future know-how and patents in the field of arterial incision and dilation to treat stenosis.  The TTA provided that California law would govern the TTA's interpretation and enforcement.  Effective January 1, 1993, Dr. Lary and IVT entered into the First Amendment to Technology Transfer Agreement ("Amendment").  On January 26, 1996, Dr. Lary and IVT entered into an Addendum to the TTA.  Dr. Lary licensed the '128 and '601 Patents to IVT.

The parties had a long relationship in which Dr. Lary patented numerous devices in the field.  IVT compensated Dr. Lary for his work in the field by paying him a 2% royalty on its sales of cutting balloon catheters ("Cutting Balloons") invented by a third party.  In 2001, BSC acquired IVT and assumed its rights and obligations under the TTA.  BSC continued to pay royalties on Cutting Balloons to Dr. Lary, and then at his request to his family trust, the Starbright Grantor Family Trust.  In June 2012, BSC unilaterally terminated the TTA and ceased making the royalty payments on the basis that the plaintiffs had breached the TTA by filing the present action without first seeking an audit under the TTA.

2

The parties dispute how long the TTA, and BSC's royalty obligation thereunder, would have continued but for BSC's unilateral termination.  Under its terms, the TTA would have terminated at the expiration of the "last to expire" of the LICENSED PATENTS as defined by the TTA.  The plaintiffs submit that the last such patent is Dr. Lary's '566 Patent, which expires on December 4, 2023. The plaintiffs seek damages in the nature of unpaid royalties on past sales of Cutting Balloons, and future royalties on sales of Cutting Balloons from June 13, 2012 through December 4, 2023.  BSC contends that the '566 Patent does not fall within the AGREEMENT FIELD of the TTA and thus, cannot serve as the last LICENSED PATENT to expire.  Instead, BSC contends that the '128 Patent and the '601 Patent were the only LICENSED PATENTS and that the '601 Patent was due to expire in the ordinary course in March 2013. The parties also dispute the scope of the products subject to the payment of royalties as ANCILLARY PRODUCTS.  The TTA provided for royalties on  ANCILLARY PRODUCTS, a defined term in the TTA, which the plaintiffs submit includes Cutting Balloons <u>and</u> products employed in the same procedure as a Cutting Balloon (the "Additional Ancillary Products").

Over the past twenty years, BSC has paid the plaintiffs over $20 million in royalties, even though it is undisputed that neither IVT nor BSC ever used any of Dr. Lary's patented inventions.  After it acquired IVT in 2001, BSC concluded that the literal terms of the TTA, as subsequently modified, did not require BSC to continue making payments to Dr. Lary. BSC continued to treat each generation of IVT's and BSC's "Cutting Balloon" catheter as an "ANCILLARY PRODUCT" under the TTA, and thus, continued to pay Dr. Lary a 2% royalty on the "NET SELLING PRICE" of those catheters.  Dr. Lary was diagnosed with dementia in 2008.  In 2009, BSC agreed to the assignment of Dr. Lary's royalty under the

3

TTA to the family Trust.  In 2011, around the time that Dr. Lary was formally declared incompetent to manage his own affairs, Dr. Lary's wife and two of his sons, plaintiffs Katherine Lary, Todd Lary, and Scott Lary, who had become the trustees of the Trust, decided to bring the present action.

The plaintiffs seek partial summary judgment on Count IV (Breach of Contract based on  sales of ANCILLARY PRODUCTS through December 4, 2023) of their Second Amended Complaint.  BSC filed a cross-motion on Count IV as well as Count I (Breach of Contract for underpayment of the 2% royalty due under the TTA due to improper exclusion of certain ANCILLARY PRODUCTS) and V (Alternative Breach of Contract based on sales of ANCILLARY PRODUCTS through February 11, 2014).

In Count I of their Second Amended Complaint, the plaintiffs allege that BSC underpaid the plaintiffs the royalties properly due under the TTA by improperly limiting royalty payments for ANCILLARY PRODUCTS to just BSC's sale of cutting balloon catheters ("Cutting Balloon"), and excluding other products used in Cutting Balloon procedures, such as guide wires and stents.  BSC[1] seeks partial summary judgment on Count I based on its interpretation of ANCILLARY PRODUCTS under the TTA.

---

[1] In 2001, an affiliate of the defendant Boston Scientific acquired IVT for more than $400 million. (Pls.' Statement of Material Facts) (DE# 165, 6/5/13) (Radisch Deposition 87:14-16) Through a series of acquisitions and mergers, Defendant Boston Scientific SciMed, Inc. is now the successor-in-interest to the rights and obligations of IVT under the TTA.  (Admitted in BSC Answer at ¶ 4) Defendant Boston Scientific SciMed, Inc. is a wholly-owned subsidiary of Defendant Boston Scientific Corporation (collectively "BSC"). (Admitted in BSC Answer at ¶ 4) (Id.)  As part of the acquisition, BSC through a subsidiary acquired the patents that Dr. Lary previously assigned to IVT. BSC does not dispute these facts.  See Boston Scientific's Statement of Material Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Count IV of Second Amended Complaint at ¶¶ 38-39. (DE# 183, 6/26/13).

In Count IV of their Second Amended Complaint, the plaintiffs allege that the assigned U.S. Patent 6,951,566 entitled "Reciprocating cutting and dilating balloon" (the "'566 Patent") should be treated as the equivalent of a LICENSED PATENT under the TTA, which would continue BSC's obligations to pay royalties to the plaintiffs for ANCILLARY PRODUCTS until December 4, 2023, the date when the '566 Patent expires.  In 2002, at the request of IVT, Dr. Lary assigned his rights in the '566 Patent to a subsidiary of BSC.

  The plaintiffs and BSC filed cross-motions for summary judgment on Count IV, arguing that the issue should be determined by the Court as a matter of law.  The TTA expressly provides that California law governs the contract.  TTA § 13.3 ("This Agreement shall be construed, interpreted and applied in accordance with the laws of the State of California) (DE# 83-1, 7/5/13). The plaintiffs argue that the plain meaning of the words in the TTA relating to the definition of LICENSED PATENTS supports the plaintiffs' position that the eight patents that Dr. Lary assigned to IVT and BSC from 1995 to 2002 (the "Assigned Patents") qualify as LICENSED PATENTS under the TTA.

In Count V of the Second Amended Complaint, the plaintiffs allege in the alternative that Canadian Patent '468 qualifies as a LICENSED PATENT, in part because it covers the same invention covered by the U.S. '601 Patent, which was expressly designated as a LICENSED PATENT in the Amendment to the TTA.  The Canadian '468 Patent would extend BSC's royalty obligations under the TTA until February 11, 2014, when the Canadian '468 Patent was due to expire.  BSC argues that the Canadian '468 Patent is not a LICENSED PATENT and expired previously due to non-maintenance by BSC.

It is undisputed that the '128 Patent entitled "Coronary Cutting and Dilating Instrument" expired no later than June 16, 2001; the '601 Patent expired on March 30,

2013; BSC ceased paying maintenance fees for the '468 Patent in 2010; and the '566 Patent is scheduled to expire on December 4, 2023. Had the maintenance fees been paid, the '468 Patent would have expired on February 11, 2014. The '566 Patent is scheduled to expire in the ordinary course on December 4, 2023. None of the subject patents discloses or claims patentable subject matter which is directed to the art of catheter adapters, dilatation catheters without features for making incisions, guide wires, guide catheters, inflators, introducer sheaths, femoral entry needles or angiographic catheters. No third party has brought a claim for invalidity or notified BSC or the plaintiffs of a potential claim of invalidity for any of the subject patents.

The cross-motions for summary judgment raise the following issues: 1) whether BSC improperly terminated the TTA in June 2012 on the ground that the plaintiffs did not seek an audit before filing suit; 2) which patent is the last to expire for purposes of determining the termination date of the TTA; 3) whether BSC's return of Dr. Lary's Assigned Patents in November 2012 was effective; 4) whether the Assigned Patents qualify as LICENSED PATENTS under the TTA; and 5) whether ANCILLARY PRODUCTS include products other than Cutting Balloons.

## LEGAL STANDARDS

### I.   Summary Judgment Standard

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation omitted). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. Id. at 248.

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324; see also FED. R. CIV. P. 56(c). In meeting this burden the nonmoving party "must do more than simply show

7

that there is a metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u> <u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." <u>Id.</u> at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Id.</u>

## II.   <u>Contract Construction under California Law</u>

The general rules regarding ambiguity under California law apply.  <u>See</u> .  TTA § 13.3 ("This Agreement shall be construed, interpreted and applied in accordance with the laws of the State of California) (DE# 83-1, 7/5/13).   Under California law, courts are to construe the ordinary meaning of a word in a contract unless a specialized or technical meaning is indicated.  Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."); <u>Scott v.</u> <u>Cont'l Ins. Co.</u>, 44 Cal. App. 4th 24, 30 (1996) ("[T]he ordinary sense of a word is to be found in its dictionary definition.").

Section 1638 of the California Civil Code prescribes that "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." <u>Id.</u> (<u>quoting</u> Cal. Civ. Code § 1638).  "'In the construction of a statute or instrument, the office of the Judge is to simply ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction, if possible, to be adopted as will give effect to all.'" <u>Id.</u> (<u>quoting</u> Cal.

8

Civ. Code § 1858; <u>see</u> Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together ...."")).

Under California law, "[w]hen the meaning of the words used in a contract is disputed, the trial court engages in a three-step process[: 1)] it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible[; 2)] [i]f, in light of extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract[; and 3)] [w]hen there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." <u>Wolf v. Walt Disney Pictures and Television</u>, 162 Cal. App. 4th 1107, 1126 (Cal. 2d Ct. App. 2008)(internal citations omitted) (finding "nothing improper about the court, rather than the jury, deciding the contract interpretation issue") <u>Id.</u> at 1128.  "This is true even when conflicting inferences may be drawn from undisputed extrinsic evidence or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation."  <u>Id.</u> at 1126-27 (internal citations omitted).  Under California law, the court interprets the contract unless the credibility of conflicting extrinsic evidence is involved.  <u>Id.</u> at 1127 (citation omitted).

Under California law, the rule of construction that an ambiguous word will be construed against the drafter applies only "[i]n cases of uncertainty not removed by the preceding rules" of construction in the California Civil Code.  Cal. Civ. Code § 1654. The rule requiring ambiguities to be resolved against the drafter "is a general rule; it does not operate to the exclusion of all other rules of contract interpretation.  It is used when none of the canons of construction succeed in dispelling the uncertainty."

Oceanside 84, Ltd. v. Fid. Fed. Bank, 56 Cal. App. 4th 1441, 1448 (Cal. Ct. App. 1977).

"Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning."  United States v. King Features Entm't, Inc., 843 F.2d 394, 398 (9th Cir. 1988) (citing Int'l Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1406 (9th cir. 1985)).  "Interpretation of a contract is a matter of law, including whether the contract is ambiguous."  Id. (citing Beck Park Apts. v. U.S. Dept. of Housing, 695 F.2d 366, 369 (9th Cir. 1982)).  Finally,

> [u]nder California law, even if the written agreement of the parties is clear and unambiguous on its fact, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible.  Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871 (9th Cir. 1979), cert. denied, 444 U.S. 981 (1979); Union Bank v. Winnebago Indus., Inc., 528 F.2d 95, 98 (9th Cir. 1975).  However, if after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.  Brobeck, 602 F.2d at 871.

Id.

## ANALYSIS

**I.    The Plaintiff Is Entitled to Judgment in its Favor on Count IV.**

In Count IV of the plaintiffs' Second Amended Complaint, the plaintiffs allege that the defendants breached the Technology Transfer Agreement ("TTA") when they wrongfully terminated the TTA on June 12, 2012 and ceased making payments of a 2% royalty on the net selling price of all ancillary products sold by the defendants through the expiration of the TTA.  The plaintiffs claim that the TTA would not have expired until

10

December 4, 2023, the date on which the last licensed patent, namely the "566 Patent," was due to expire.

On October 24, 2011, the plaintiffs commenced this action seeking a declaration that BSC's royalty obligation would continue until December 4, 2023 (Count I), damages for underpayment of past royalties (Count II), and an equitable accounting of past royalties (Count III). On February 12, 2012, BSC sent Dr. Lary a notice of breach (the "First Notice of Breach") alleging that his "claims" in this action violated Section 6.06 of the TTA (the audit provision) and further demanding that the plaintiffs withdraw their claims within the TTA's 90-day cure period. In response to the plaintiffs' request for clarification as to what "claims" allegedly violated TTA § 6.06 (audit provision), BSC sent a second notice on March 12, 2012, specifying Counts II and III (the "Second Notice of Breach").

During the pendency of the 90-day cure period, the plaintiffs' obtained BSC's consent to file an Amended Complaint seeking a declaration from this Court in a new Count IV as to whether the plaintiffs' maintenance of Counts II and III violated Section 6.06. In an abundance of caution and within the 90-day cure period, the plaintiffs sought to withdraw counts II and III of their Amended Complaint in order to comply with the Second Notice of Breach, leaving intact Count IV for declaratory relief. Over BSC's objections, the Court permitted the plaintiffs to dismiss Counts II and III without prejudice.

Despite the plaintiffs' timely withdrawal of Counts II and III within the 90-day cure period, BSC terminated the TTA on the basis of Count IV and ceased paying royalties after June 12, 2012.

### A.   Because the Audit Clause Did Not Give BSC the Right to Terminate, BSC Improperly Terminated the TTA in June 2012.

The plaintiffs assert that BSC's termination is wrongful on four grounds: 1) BSC failed to provide the plaintiffs' with "fair notice" of the alleged breach and an opportunity to cure as required by the TTA; 2) BSC consented to the plaintiffs' alleged breach, namely the plaintiffs' filing of an amended complaint adding a new count for declaratory judgment; 3) the plaintiffs' filing of the new count for declaratory judgment did not violate the TTA's permissive audit clause; and 4) even if the filing did violate the audit clause, such action fell short of a material breach justifying termination under the TTA. (Pls.' Motion for Partial Summary Judgment, at 1)(DE# 164, 6/5/13)

BSC argues that BSC properly placed the plaintiffs on notice of BSC's intention to terminate the TTA based on 1) the plaintiffs' failure to meet the conditions set forth in the TTA's audit provision; 2) that the notice of termination was valid to include the subsequently filed declaratory judgment count (Count IV); and 3) that the plaintiffs failed to remedy their breach.  BSC maintains that the plaintiff's addition of the declaratory judgment action based on Count II and Count III of the original complaint constituted a material breach of the TTA's audit clause as well.  Additionally, BSC argues that despite its consent to the amendment adding the count for declaratory judgment, BSC did not waive any challenge to the merits of the count for declaratory judgment.

The audit provision of the TTA (Section 6.06) provides:

> IVT agrees to keep record[s] showing the sales of
> LICENSED PRODUCTS sold under the license herein
> granted in sufficient detail to enable the royalties payable
> hereunder by IVT to be determined, and further agrees to
> permit its books and records to be examined from time to
> time, but not more than twice in any calendar year, to the

12

> extent necessary to verify the proper payment of royalties.
> Such examination is to be made at the expense of the LARY
> by an independent auditor appointed by the LARY who shall
> report to the LARY only the amount of royalty payable for
> the period under audit.  IVT agrees to retain each record
> generated under the provisions of this paragraph 6.06 for a
> period of three (3) years.

TTA § 6.06.

The plaintiff argues that the audit provision "neither imposes a condition

precedent upon Plaintiffs to conduct an audit prior to bringing suit, nor otherwise waives

or even limits Plaintiffs' judicial remedies."  (Pls.' Motion for Summary Judgment at 9)

(DE# 164, 6/5/13)  The Court agrees.  Section 6.06 imposes affirmative record-keeping

duties on BSC as successor to IVT for the benefit of Dr. Lary to be able to verify the

amount of royalties payable to him.  The audit provision mandates that BSC, as

successor to IVT,

> keep record[s] showing the sales ... in sufficient detail to
> enable the royalties payable hereunder by [BSC] to be
> determined, and ... to permit its books and records to
> examined from time to time, but not more than twice in any
> calendar year...to retain each record ... for a period of three
> (3) years.

(TTA § 6.06)  The audit provision is permissive as to Dr. Lary.  If Dr. Lary elected

to conduct an audit, he would have to appoint an auditor and pay the expense of the

audit. He was limited to no more than two audits per year.  Nothing in the provision

required Dr. Lary to conduct an audit.

The audit provision did not create a condition precedent to filing a lawsuit.  BSC's

reliance on the audit provision to justify its termination of the TTA on June 12, 2012 is

baseless. See Rambus Inc. v. Hynix Semiconductor Inc., 629 F. Supp. 2d 979, 1012-13

13

(N.D. Cal. 2009) (finding Rambus' purported termination for the alleged audit breach was pretextual). The plaintiffs' filing of the present action and in particular, Count IV for declaratory relief, did not constitute a material breach of the TTA.  See Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1231 (S.D. Fla. 2009) ("[T]he purpose of the Declaratory Judgment Act is to clarify the legal relations at issue and to settle controversies prior to a legal breach of duty or contract.")(citation omitted). BSC's termination on the grounds that the plaintiffs breached the TTA by seeking an interpretation of the TTA (i.e. seeking declaratory relief) is without merit.

BSC's wrongful termination and failure to pay royalties after June 12, 2012 constitute breaches of the TTA.  See Rambus, 629 F. Supp. 2d at 1012-13; see also In re 4Kids Entm't, Inc., 463 B.R. 610, 683-89 (Bankr. S.D.N.Y. 2011) ("terminating a contract without complying with the notice and cure provisions therein is itself a material breach") (citation omitted); see also ProMex, LLC v. Hernandez, 781 F. Supp. 2d 1013, 1017 (C.D. Cal. 2011)("Whether a particular breach will give the injured party the right to refuse further performance, i.e., terminate the contract, turns on whether the breach was material.").  Even if the plaintiffs breached the audit provision, which this Court finds they did not, such an alleged breach would not be "material" to justify BSC's unilateral termination of the TTA and refusal to pay royalties under the TTA.

### B.   The TTA's Termination Date Is December 4, 2023 (Expiration of the Last to Expire of the LICENSED PATENTS)

The parties filed cross-motions for summary judgment on Count IV regarding the issue of whether the Assigned Patents qualify as LICENSED PATENTS under the TTA, and therefore, whether the last to expire of the Assigned Patents extends the

14

termination date of the TTA to December 4, 2023, when the '566 Patent expires, as the

plaintiffs contend or March 30, 2013, when the '601 Patent[2] expires, as BSC contends.

See Plaintiff's Motion and Reply at 10, BSC's Opposition at 13, as well as BSC's Motion

for Partial Summary Judgment on Counts I, IV and V of the Second Amended

Complaint (the "BSC Motion")( filed under seal on June 6, 2013), and Plaintiffs'

Opposition thereto ("Plaintiffs' Opposition")(DE# 184-1). Alternatively, BSC contends

that the TTA terminated in November 2012, when BSC unilaterally relinquished any

licenses and rights (to the extent not already terminated) to any of Dr. Lary's patents

and returned them to Dr. Lary based on Mr. Radisch's testimony and declaration that

IVT had no obligation to accept or retain a license to any or all of Dr. Lary's patents and

could give the patents back to Dr. Lary if IVT decided not to pursue further efforts to

commercialize a patent from Dr. Lary.  (BSC's Opposition SMF ¶99).  The plaintiffs

argue that "BSC cannot avoid liability for breach by 'giving back' the patents after most

of their useful lives have expired... BSC's attempt to use Mr. Radisch's testimony to add

a provision to the TTA allowing for such a 'give back' right (rather than to construe an

ambiguous term or explain a course of performance) constitutes an improper and

inadmissible use of extrinsic evidence."  Pls. Reply at 12 (citing Pls.' Opposition to

BSC's Motion at 11-12, 14-15).  BSC relies on Mr. Radisch's testimony regarding the

parties' understanding regarding return of the Assigned Patents without any course of

conduct.  Moreover, Neil Nydegger, IVT's outside counsel who drafted the TTA, testified

during his deposition that none of the language he drafted in the TTA created an early

---

[2]U.S. Patent No. 5, 372,601 (the"'601 Patent") became a LICENSED PATENT by virtue of the Amendment to the TTA.

termination right in favor of IVT.  (Pls.' Facts ¶ 65) This Court finds that the use of Mr.

Radisch's testimony to <u>add</u> a provision to the TTA where the TTA is silent is an

inappropriate use of extrinsic evidence.  <u>See</u> <u>Horne v. Harley-Davidson, Inc.</u>, 660 F.

Supp. 2d 1152, 1161 (C.D. Cal. 2009) (prohibiting use of any "extrinsic evidence,

whether oral or written, to vary, alter or add to the terms of an integrated written

instrument"); <u>Appling v. State Farm Mut. Auto Ins. Co.</u>, 340 F.3d 769, 778 (9th Cir. 2003)

(rejecting extrinsic evidence which sought to "add a 'good cause' term to the

Termination Provision" rather than "interpret the words of that provision").  Moreover,

Section 11.02 of the TTA prohibits the assignment or transfer of "rights and licenses

granted by each party" without "the written consent of the other party...."  Notably,

BSC's 30(b)(6) corporate representative acknowledged in his deposition that BSC's

return of the LICENSED PATENTS to Dr. Lary would require "mutual agreement." (Pls.'

Facts ¶ 65)  Additionally, Mr. Radisch testified that IVT wanted Dr. Lary's technology in

order to "own" the entire market for this innovative treatment. (Facts ¶ 35) (BSC's SMF

in Opposition ¶ 35) (<u>quoting</u> Radisch Deposition[3])  Ownership of Dr. Lary's patents

allowed IVT to prevent competitors from commercializing Dr. Lary's patents. (Facts ¶

37)  Based on the express terms of the TTA and Mr. Nydegger's testimony, this Court

finds that IVT did not have a right to terminate the TTA early by returning the unexpired

---

[3]Mr. Radisch testified at his deposition:
Q.  Who requested that those patents get assigned to IVT?
A.  Basically, the corporation did.  I mean, IVT was a venture capital-funded company.
At the time, the – assigning a patent to a company really meant that you owned it and if
– as far as doing something with the company, either going public or finding someone
to acquire it or to merge with it, you know, that was a meaningful aspect of that.  So the
concept was – is we wanted to own our technology.
(DE# 159-08 [Radisch Tr.] 36:5-14)

patents to Dr. Lary in November 2012 after having them for approximately ten years.

The relevant provisions of the TTA regarding termination include: Sections 12.01 and 12.02 ("Term and Termination" provision); Section 4.03 ("License Grant" provision); and Section 6.04 ("Payments - Royalties").

Section 12.01 of the TTA provides:

> If either party shall commit any material breach of any covenant herein contained, and if either party shall fail to remedy any such breach within ninety (90) days after written notice thereof from the other party, the notifying party may, at its option, terminate this Agreement by notice in writing to such effect.

As explained above, the audit provision of the TTA did not authorize BSC to terminate the TTA.  Thus, Section 12.01 does not apply.  Rather, Section 12.02 of the TTA governs and expressly provides:

> Unless previously terminated in accordance with other provisions of this Agreement, this Agreement and the licenses granted hereunder shall run in accordance with the provisions of 4.03 of this Agreement or the expiration of the last to expire of the LICENSED PATENTS and shall thereupon terminate.

Thus, the TTA terminates at the "expiration of the last to expire of the LICENSED PATENTS." Section 4.03 of the TTA provides:

> The term of the license granted in paragraphs 4.01 and 4.02 of this ARTICLE IV shall be for the life of any of the LICENSED PATENTS.

Section 6.04 of the TTA provides the termination date of the duty to pay royalties.  Section 6.04 provides:

> The obligation to pay royalties shall terminate as to any LICENSED PATENT under which a license is herein granted on expiration of the LICENSED PATENT.  The obligation to

17

pay royalties shall terminate as to any ANCILLARY
PRODUCT upon termination of this Agreement.

The TTA broadly defines LICENSED PATENTS in Section 3.04:

LICENSED PATENTS means United States Patent No.
4,273,128, which issued to LARY on June 16, 1981, for an
invention entitled "Coronary Cutting and Dilating Instrument",
and all patents through the world (including patents on
IMPROVEMENTS, patents and certificates of addition and
utility models, as well as divisions, reissues, continuations,
continuations-in-part, reexaminations certificates, renewals,
patents of importation, and extensions of the foregoing),
applications therefor, and patents which may issue upon
such applications (i) as to which patents or applications
LARY has at any time prior to or during the term of this
Agreement the right to grant licenses of the scope of the
licenses granted in this Agreement, (ii) which cover
inventions or designs in the AGREEMENT FIELD, and (iii)
which have not be finally adjudged invalid or unenforceable
by a court of competent jurisdiction.

The TTA's Addendum dated June 27, 1991 (DE# 83-3, 7/5/12) (Pls.' Facts, Ex.

M; DE# 165; 6/5/13), expanded[4] LICENSED PATENTS defined in TTA § 3.04 to include

_____

[4]The Addendum did not alter the three LICENSED PATENT CONDITIONS.  The
Addendum further provided that "Provision 3.01 shall read as follows:
    3.01 AGREEMENT FIELD means all technology and know how pertaining
    to devices which employ balloon technology to treat (seal) openings in
    vessels made by incision or puncture.

Addendum, paragraph 4.  (DE# 83-3, 7/5/12).  Michael Klicpera, corporate counsel for
IVT and the individual who drafted the Addendum, testified that this provision, relating
to "sealing technology" or "sealing products," was intended to be read as an addition to
the Agreement Field in the original TTA, adding that "[t]he intent was not to replace it."
(Plaintiffs' Facts ¶ 25, Pls.' Ex K (Klicpera Depo.)(DE# 159-7) at 4)( DE# 165, 65/13).
Likewise, IVT's Vice President of Research and Development at the time, Herbert
Radisch, who testified that he "had the most contact with Dr. Lary and worked closely
with him during [Radisch's] years at IVT," averred that "[i]t was the intent of IVT and Dr.
Lary, and clearly understood by everyone involved, that the Addendum's new definition
of 'Agreement Field' supplemented, rather than replaced, the original definition of
"Agreement Field" in the TTA."  (Id. at ¶ 22, Pls.' Ex. A (Radisch Declaration) ¶ 10).

"a future patent titled 'DEVICE AND METHOD FOR THE CLOSURE OF A VASCULAR PUNCTURE OR INCISION SITE....'" (Id.)  The Addendum did not alter the three Licensed Patent Conditions.

The LICENSED PATENTS definition has two parts: 1) the definition expressly includes the '128 Patent as one of the LICENSED PATENTS under the original TTA; and 2) the definition further includes as additional LICENSED PATENTS those patents that meet three conditions.  The three conditions for additional LICENSED PATENTS are "patents which may issue upon such applications...[:]

> (i) as to which patents or applications [Dr. Lary] has at any time prior to or during the term of this Agreement the right to grant licenses of the scope of the licenses in this Agreement,
> (ii) which cover inventions or designs in the AGREEMENT FIELD, and
> (iii) which have not been finally adjudged invalid and unenforceable by a court of competent jurisdiction.

Section 3.04 of the TTA (hereinafter collectively referred to as "Licensed Patent Conditions").

The TTA defined "AGREEMENT FIELD" in TTA § 3.01 as follows:

> AGREEMENT FIELD means all technology and know how pertaining to devices which are useful for the concomitant longitudinal incision of plaque and radial dilatation of arteries of the human body in the treatment of stenotic and occlusive artery disease.

After executing the Addendum, which was effective January 26, 1996, and until IVT was acquired by BSC in April 2001, IVT continued to distribute to Dr. Lary the 2% semi-annual royalty payments under the original TTA for sale of incision products.  (Id. at ¶ 29, Pls.'s Ex. G (Summary of Royalty Payments) and C (Radisch Deposition)).

19

BSC argues that the "[p]laintiffs' attempt to extend the term of the TTA to 2023 based on the assignment of purported 'LICENSED PATENTS' (DE# 164 at 12-25) is without merit" on the following grounds: 1) "the plaintiffs' attempt to characterize later-expiring patents as LICENSED PATENTS violates the rules of construction;" and 2) the plaintiffs "offer parol evidence from a witness (Herbert Radisch) who construed the term LICENSED PATENT broadly;" the "same witness ... also testified that BSC could terminate its obligations with respect to any LICENSED PATENT by returning the patent to Dr. Lary."  (Id.)  BSC argues that "if Radisch's testimony is credited, BSC's obligation to pay royalties ended in November 2012, when BSC returned any unexpired patents to Dr. Lary."  BSC's Opposition at 13 (DE# 182, 6/26/13)

The plaintiffs urge the Court to weigh heavily Mr. Radisch's testimony in support of the plaintiffs' construction of "concomitant," but to give little weight in support of BSC's position.  BSC argues that if the Court credits Mr. Radisch's testimony, then it must credit the portion of his declaration and testimony wherein Mr. Radisch believes BSC has the right to return Dr. Lary's Assigned Patents to terminate BSC's royalty obligations under the TTA.  Plaintiffs' Response at 14  (DE# 184-1, 6/26/13).  The plaintiffs maintain that the divergent treatment of Mr. Radisch's testimony turns on his relationship to the parties.  Mr. Radisch formerly served as an officer of IVT at the time IVT entered into the TTA with Dr. Lary and continued in that position after BSC acquired IVT.  (Pls.' Facts ¶ 38) When BSC relies on Mr. Radisch's testimony to support BSC's construction of the TTA, BSC confirms the intent of one party, namely IVT.  When the plaintiffs' rely on Mr. Radisch's testimony to support the plaintiffs' construction of the TTA, the plaintiffs confirm that IVT's construction was the same as

20

Dr. Lary's construction and thus, the mutual intent of the parties. Pls.' Response at 14 (DE# 184-1, 6/26/13).

Additionally, the plaintiffs rely on Mr. Radisch's testimony to explain the purpose behind IVT's actual course of dealing with Dr. Lary during the term of the TTA. For example, Mr. Radisch explains that IVT requested that Dr. Lary assign his Assigned Patents to IVT because IVT treated the Assigned Patents as covering devices within the AGREEMENT FIELD. (Pls.' Motion at 23)   BSC relies on Mr. Radisch's understandings that were never subject to any course of conduct by both parties during the term of the TTA. For example, Mr. Radisch's understanding that BSC could terminate the TTA if BSC decided not to commercialize the LICENSED PATENTS, which BSC invoked unilaterally after BSC had already terminated the TTA. The plaintiffs rely on Mr. Radisch's testimony that is adverse to the interests of his former employers, IVT and BSC. The Court agrees that it should accord greater weight to the plaintiffs' use of Mr. Radisch's testimony than to BSC's use. It is undisputed that Mr. Radisch is one of only two witnesses with personal knowledge regarding the negotiations and the terms of the TTA. Neil Nydegger, IVT's outside counsel who drafted the TTA, is the other witness.

### 1.    The Assigned Patents

It is undisputed[5] that on December 11, 2002, at the request of IVT (now acquired

---

[5]In BSC's Opposition to plaintiffs' statement of material facts, BSC disputed paragraph 44 in part and directed the Court to its response to paragraph 41 wherein BSC stated "BSC does not dispute that Dr. Lary sent three provisional patent applications on April 14, 2002 'for the concept of the conical dilating balloon with cutting blades.' (Pl. Ex. O) ... BSC disputes that Dr. Lary's 'developmental work' was performed within the scope of the TTA Agreement Field after the execution of the Addendum."

by BSC), Dr. Lary assigned his rights in what became the '566 Patent (based on provisional patents) directly to a BSC subsidiary. (The '566 Patent and '405, '941, '944, '913, '158, '108, and '151 patents referred herein collectively as the "Assigned Patents." (Pls.' Facts ¶ 44, Ex. N; admitted in BSC Answer ¶ 36; December 10, 2002 letter from BSC/IVT to Dr. Lary requesting assignment and signed assignment document, attached as Ex. Q) (DE# 165, 6/5/13).  It is also undisputed that the '566 Patent is scheduled to expire in the ordinary course on December 4, 2023 and no third party has brought a claim for invalidity of the '566 Patent or notified BSC of a potential claim of invalidity. (Id. at ¶ 46)

The patents assigned by Dr. Lary to BSC disclosed devices that did not incise and dilate at the same time, unlike the invention disclosed in the Barath Patent, which did cut and dilate in one action. (DE# 182 at 17) BSC argues that because Dr. Lary's patents disclosed devices that did not incise and dilate at the same time, they did not satisfy the definition of AGREEMENT FIELD and thus, were not LICENSED PATENTS based on the second clause of Section 3.04, that is "all patents ... (ii) which cover inventions or designs in the AGREEMENT FIELD."  (TTA § 3.04(ii))  BSC claims that the '128 Patents two-step action of sequentially incising and dilating the arteries does not satisfy the AGREEMENT FIELD's requirement that the incising and dilating steps occur as "concomitant" actions - a term that BCS defines as requiring simultaneous

---

(BSC's Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment at ¶¶ 41, 44)(emphasis added).  The disputed portion of BSC's opposition is negated by this Court's ruling on the plaintiff's motion for summary judgment on the defendants' counterclaim, wherein the Court rejected BSC's position that the Addendum somehow limited the scope of the agreement field under the TTA.

incision and dilation.  In their opposition to BSC's partial motion for summary judgment,

the plaintiffs argue:

> In effect, BSC claims that the parties deliberately selected
> the word concomitant first to <u>disqualify</u> the '128 Patent (and
> later the '601 Patent as identified in the Amendment) from
> satisfying the requirements of a LICENSED PATENT, and
> then to <u>qualify</u> as LICENSED PATENTS only those patents
> covering devices that used a one-step action to
> simultaneously incise and dilate the arteries - a categorical
> departure from the family of incising and dilating devices
> covered by Dr. Lary's then-existing '128 Patent, his pending
> '601 Patent, and all eight of his future Assigned Patents.
> According to BSC, because none of the eight Assigned
> Patents covered a device that performed the required one-
> step action, none of the eight Assigned Patents could qualify
> as a LICENSED PATENT, thereby leaving the '601 Patent
> as the last to expire LICENSED PATENT with an expiration
> date of March 30, 2013.

Pls.' Opposition at 15 (DE# 184-1, 6/26/13) (citing BSC SJ Motion at 14) (DE

171; 6/6/13) (Sealed)  BSC argues that "[b]ecause none of Dr. Lary's other patents (1)

were expressly defined as LICENSED PATENTS or (2) incised and dilated at the same

time, only the '128 and '601 Patents were LICENSED PATENTS." (BSC SJ Motion at

14) (DE 171; 6/6/13) (filed under sealed)   The '128 Patent expired on June 16, 2001.

BSC concludes that "if not earlier terminated, the TTA terminated on March 30, 2013,

the date when '601 Patent" expired.  (<u>Id.</u>)

### 2.    The Meaning of "Concomitant" in the AGREEMENT FIELD of the TTA.

The plaintiffs argue that the Assigned Patents are LICENSED PATENTS

because they fall within the AGREEMENT FIELD, i.e. technology "for the concomitant

longitudinal incision of plaque and radial' dilatation of arteries," based on the plaintiffs'

23

meaning of the word "concomitant."  The plaintiffs essentially argue that "concomitant" means both "sequential" and "concurrent." (Pls.' Motion at 20) (DE# 164);(Pls.' Reply at 10) (DE# 198, 7/17/13). BSC essentially argues that "concomitant" means "simultaneous."  (DE# 182 at 16).

At issue is the meaning of "concomitant" in the phrase "for the concomitant longitudinal incision of plaque and radial dilatation of arteries" in the definition of AGREEMENT FIELD under the TTA.  BSC does not dispute that the devices disclosed in Dr. Lary's Assigned Patents are useful for both the "incision of plaque" and the "radial dilatation of arteries" as specified in the AGREEMENT FIELD definition.  Instead, BSC disputes that the Assigned Patent devices perform these two steps in a "concomitant" manner.  BSC contends that concomitant requires the two steps to occur <u>at the same time</u>. (BSC's Motion at 13) (DE#171, 6/6/13);(BSC Response in Opposition to Pls.' Motion at 16)(DE# 182, 6/26/13). BSC further contends that the Assigned Patents disclose devices that purportedly perform these two steps <u>sequentially</u>, rather than simultaneously.  BSC argues that because the Assigned Patents, including the '566 Patent, disclosed devices that did not incise and dilate at the same time, they fail to satisfy the concomitant requirement in the AGREEMENT FIELD and thus, the Assigned Patents fail to qualify as LICENSED PATENTS based on the second clause of Section 3.04. (<u>Id</u>. at 17) It is BSC's position that to include one of Dr. Lary's patents in the TTA, it was necessary to define it expressly as a LICENSED PATENT, as was done with the '128 Patent in the first clause of Section 3.04 and with the '601 Patent in the First Amendment. (<u>Id</u>.)  BSC argues that because none of Dr. Lary's other patents (1) were expressly defined as LICENSED PATENTS or (2) incised or dilated at the same time,

24

only the '128 and '601 Patents were LICENSED PATENTS.  The '128 Patent expired

on June 16, 2001. Thus, BSC contends that the termination date of the TTA would be

March 30, 2013, the date when the '601 Patent expired, if the TTA was not earlier

terminated. (Id.)  BSC further argues that the plaintiffs' representation to the IRS (in a

2008 appraisal of the royalty interest for tax purposes) that the royalties to the family

trust ended in 2013 supports BSC's position that the '601 Patent's expiration date

governs.  The plaintiffs maintain that the 2008 appraisal is irrelevant because the

appraisal expressly disclaims basing the valuation on any future legal contingencies.[6]

The Court agrees. The TTA's termination date will be determined in this action.

The plaintiffs argue that BSC's position that the Assigned Patents do not satisfy

the "concomitant" condition fails for the following four reasons: (1) the Plaintiffs'

definition of concomitant is consistent with the ordinary definition of concomitant

meaning "accompanying;" (2) defining concomitant to cover sequential steps in a

medical procedure is consistent with the operation of the devise disclosed in the '128

Patent, which is the only patent expressly included within the definition of LICENSED

PATENTS in the TTA; (3) the extrinsic evidence of the deposition testimony of IVT's

Herbert Radisch supports the plaintiffs' position that concomitant did not require the two

_____

[6]David Bohlman, who performed the appraisal in 2008 in connection with Dr. Lary's establishment of the Starbright Trust for estate planning purposes, sought to determine the market value of Dr. Lary's royalty stream for the purpose of Dr. Lary selling his interest under the TTA to Starbright for market value.  Mr. Bohlman based his appraisal on the fact that BSC had already notified Dr. Lary that it would terminate royalty payments in 2013, at that time five years in the future, and that he could not make any determination as to the likely outcome of any future lawsuit that Dr. Lary may or may not bring claiming a later termination date.  (Pls.' Facts ¶ 70-71) Mr. Bohlman told Todd Lary that "he couldn't go beyond 2013, because it was too much of an unknown."  (Id.  ¶ 70)

actions to occur at the same time; Mr. Radisch defined concomitant as "combining," "going along with," or "go[ing] together" (Pls.' Facts ¶¶ 60,62);  and (4) the plaintiffs are entitled to the benefit of the broadest reasonable definition of the word concomitant since IVT drafted the TTA and selected the word "concomitant" rather than the more limiting word "concurrent."

Pursuant to California law, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."  Cal. Civ. Code § 1644; see Scott v. Cont'l Ins. Co., 44 Cal. App. 4th 24, 30 (1996) ("[T]he ordinary sense of a word is to be found in its dictionary definition.")

The plaintiffs' submit that the ordinary definition of concomitant is "accompanying" from the *Merriam-Webster* and *Oxford* online dictionaries. (Facts ¶ 55; Ex. S) (DE# 165, 6/5/13) Concomitant originates from the Latin roots: *con* means "together with" and *comitari* means "companion."  (Id.)  The plaintiffs' definitions of concomitant are as follows:

| Dictionary | Definition |
|---|---|
| Merriam-Webster Dictionary Online | "accompanying especially in a subordinate or incidental way" |
| Oxford Dictionaries Online | "naturally accompanying or associated" |

The plaintiffs point out that BSC has used the word "concomitant" in its "sequential" meaning.  See Excerpt from2007-2010 Pelvic Floor Reconstructive Procedures Coding and Payment Guides  (Facts ¶ 59; Ex. U) (DE# 165, 6/5/13) (using

"concomitant" to refer to two separate procedures performed by two separate physicians on the same patient during the same operative session).

BSC submits that concomitant means "concurrent" or "at the same time." (Deposition of Steven McAuley, BSC 30(b)(6) Corporate Representative ("McAuley Deposition") (DE# 159-3 and 159-4, 199:12-14, 206:6-9) Mr. McAuley's understanding of the meaning of concomitant was based on his review of dictionary definitions. (McAuley Deposition 206:23-25).  BSC offers the definition of concomitant from a variety of dictionaries:

| Dictionary | Definition |
|---|---|
| Oxford Advanced American Dictionary Online | "happening at the same time as something else" |
| Webster's Third New International Dictionary | "occuring along with or at the same time as" |
| Webster's II New Riversdale University (1984) | "occurring or existing concurrently" (concurrent defined as "occurring at the same time) |
| Oxford Dictionaries Online | "naturally accompanying or associated" (accompany defined as "to be present or occur at the same time (as something else)) |
| American Heritage Dictionary of the English Language (1980) | "existing or occurring concurrently, accompanying, attendant" and defining "concurrent" as "happening at the same time or place" |

"An ambiguity arises when language is reasonably susceptible to more than one application to material facts.  There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application."  Alameda County Flood Control v. Dept., 213 Cal. App. 4th 1163, 1179 (Cal. App. 3d Dist. 2013)(citing California State Auto. Inter-Ins. Bureau v. Superior Court, 177 Cal. App. 3d 855, 859, n.1 (1986)).  "'[L]anguage in a contract must

be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*'" <u>Id.</u> (quoting <u>Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.</u>, 5 Cal. 4th 854, 867 (1993)).

California's parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates ... or explain extrinsic ambiguity or otherwise interpret the terms of the agreement...." Cal. Civ. Code § 1856. To determine whether language is ambiguous under California law, "it is *essential* to tether extrinsic evidence to particular language: '" The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning *which the language of the instrument is reasonably susceptible*."'" <u>Almeda County Flood Control,</u> 213 Cal. App. 4th at 1188-89 (quoting <u>Dore v. Arnold Worldwide, Inc.,</u> 39 Cal. 4th 384, 391 (2006)).

In their Reply in support of their motion for partial summary judgment, the plaintiffs argue that their interpretation of "concomitant" as meaning both sequential or concurrent is the more reasonable interpretation because it allows the '128 Patent - the only patent in existence at the time the TTA was signed - to qualify as a LICENSED PATENT. (Pls.' Reply in Support of Pls.' Motion at 10-11)(DE# 198, 7/17/13) Additionally, the plaintiffs contend that their interpretation allowed IVT to license future patents that might be improvements of the '128 Patent, which furthered IVT's business purpose. (<u>Id</u>. at 17) During his deposition, Mr. Radisch testified that he understood that future patents were covered by the LICENSED PATENTS definition. (Pls.' Facts ¶ 10)

Mr. Radisch provided the following deposition testimony:

> A:   [As to] the patents that Dr. Lary developed, we requested that they be
>      assigned to IVT.
> Q:   Based on them being devices within the agreement field?
> A:   Correct.
> Q.   So seeing this list of assigned patents, you would then assume that IVT
>      requested their assignment because they were within the agreement
>      field?
> A.   Correct.

(Radisch Deposition 71:15-23, cited in Pls.' Facts ¶ 64) Mr. Radisch also testified

that having seen the '566 Patent, it refreshed his recollection that such patent disclosed

a device in the AGREEMENT FIELD.  (Radisch Deposition 72:23-73:7, 74:13-16, cited

in Pls.' Facts ¶ 63)   BSC does not dispute that Mr. Radisch's testimony is based on his

personal understanding of what he believes occurred with the assignment of certain

patents to IVT and his personal understanding of what "concomitant" means. (BSC's

Facts in Opposition at ¶¶ 62, 63, 64) (emphasis added) Instead, BSC argues that Mr.

Radisch acknowledged that he did not recognize the listed patents and that he did not

specifically identify any patents, particularly the '566 Patent, as ones he personally

knew to be in the AGREEMENT FIELD.   (Id. at ¶ 64)(BSC ex. 1 [Radisch Tr.] 71:4-23])

However, a review of the deposition testimony reveals that after the plaintiffs' counsel

provided a copy of the '566 Patent (Ex. 7 to his deposition) to Mr. Radisch for his review

during his deposition, Mr. Radisch testified further:

> Q:   Okay.  And based upon your review of the '566 Patent, are you able to tell
>      us if that is a device within the agreement field of the TTA?
> A:   It's within the agreement field.

See Radisch Deposition 74:13-16 (BSC Ex. 1) (DE# 183-1) Thus, it is

29

undisputed that Mr. Radisch testified as one of two witnesses[7] with personal knowledge regarding the negotiations and terms of the TTA, that the '566 Patent is within the AGREEMENT FIELD. BSC's attempt to qualify Mr. Radisch's testimony as being limited by his "personal understanding" is not well taken particularly in light of the undisputed fact that Mr. Radisch was involved in the negotiations of and terms of the TTA. The dictionary definitions provide alternative meanings of "concomitant" that include "naturally accompanying or associated," "happening at the same time as something else," or "occurring along with or at the same time as." These definitions and the Latin origin of the word translated to "together with" and "companion" reveal that concomitant can mean "sequential" or "simultaneous." Mr. Radisch's testimony, which is uncontroverted,[8] confirms the plaintiffs' interpretation of concomitant to mean "sequential." It is undisputed that none of Dr. Lary's patents involved devices that cut and dilated simultaneously. BSC has used "concomitant" as "sequential" in its own literature. For these reasons, this Court finds that the TTA and the evidence in the record supports the plaintiffs' construction of "concomitant" as "sequential."

## 2. The Assigned Patents Qualify as LICENSED PATENTS under the Plain Meaning of the TTA Because the TTA Covers Future

---

[7]Notably, BSC asserts that "Mr. Radisch is the only witness with personal knowledge of the negotiations and terms of the TTA." (BSC's SMF in Support of its Motion for Partial Summary Judgment at ¶ 10 (DE# 172, 6/6/13) (filed under seal). In opposition, the plaintiffs dispute this and assert that Neil Nydegger, IVT's outside counsel who drafted the TTA, and upon whom BSC relies for its definition of ANCILLARY PRODUCTS counsel for IVT, also has personal knowledge of the negotiations and terms of the TTA. (DE# 185, 6/26/13).

[8]Mr. McAuley testified that his understanding of "concomitant" was based on a review of the definition in an unidentified dictionary. Mr. McAuley was not involved with the negotiations of or drafting of the TTA.

**Patents.**

BSC argues that the TTA's definition of LICENSED PATENTS purportedly only covered the pre-existing '128 Patent and those other pre-existing patents and patent applications that met the three Licensed Patent Conditions.  BSC maintains that the LICENSED PATENTS definition did not cover any future patents at all, thereby precluding any of the Assigned Patents, all of which issued after the TTA's execution, from  qualifying as LICENSED PATENTS under the TTA.

The LICENSED PATENTS definition contains no language limiting the phrase "all patents throughout the world" to pre-existing patents or applications as of the TTA's execution date.  There is no evidence that any such pre-existing patents or applications even existed at the time of the TTA's execution which satisfied the Licensed Patent Conditions other than the expressly identified '128 Patent.  BSC's construction effectively renders the Licensed Patent Conditions superfluous in contravention of California law.  City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 473 (1998) ("Courts must interpret language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.")

 Because the definition of LICENSED PATENTS in the TTA covered all of Dr. Lary's future patents in the AGREEMENT FIELD, all such future patents would be automatically licensed to IVT under the TTA.  (Radisch Declaration ¶ 10).  Mr. Klicpera confirmed this in his deposition with the substitution of the phrase "by operation of the TTA" instead of the word "automatically":

Q      So by operation of the [TTA], any patents that were in the agreement field

31

conceived and to practice during the term of the agreement would, by operation of this agreement, be licensed to IVT?

A      Yes.

(Klicpera Deposition, 32:24-33:3).  After the '601 Patent, IVT requested that Dr. Lary also assign his patents in the AGREEMENT FIELD to IVT.  (Radisch Declaration ¶ 10; Radisch Deposition 35:15-36:1). After the execution of the Addendum, and at BSC's request, Dr. Lary assigned five additional patents to IVT.[9]  None of these patents were covered by the Addendum because they were not patents involving sealing or closure technology; rather, the plaintiffs argue that the patents involved incision technology under the Agreement Field of the original TTA.  (Id. at ¶ 30, Pls.' Ex. C (Radisch Depo.)).

In granting the plaintiff's motion for summary judgment on BSC's Counterclaim for unjust enrichment, this Court previously found that BSC's construction of the Addendum would create the absurd result that Dr. Lary gifted at least four patents to IVT involving incision technology falling within the original TTA's "Agreement Field" after executing the Addendum.  Order Granting Plaintiffs' Motion for Summary Judgment on Defendants' Second Amended Counterclaim (D.E.# 150) at 17, n.14 (citing n. 5) (DE# 258, 10/4/13); see Salton Bay Marina, Inc. v. Imperial Irrigation Dist., 172 Cal. App. 3d 914, 933 (1985) (quoting Cal. Civ. Code § 1638) ("When interpreting a written agreement, the courts are required to avoid an 'absurd result[.]'").

Mr. Radisch testified that IVT requested Dr. Lary to assign the patents he

_____

[9]It is undisputed that Dr. Lary, individually or as co-assignor, assigned at least four patents to IVT between May 1996 and June 2000.  See Order Granting Plaintiffs' Motion for Summary Judgment on Defendants' Second Amended Counterclaim (D.E. 150) at 6 n.5 (DE# 258, 10/4/13).

developed and that the Assigned Patents were in the AGREEMENT FIELD.  (Radisch

Deposition 71:15-23).  Mr. Radisch expressly averred that the '566 Patent disclosed a

device that was within the AGREEMENT FIELD. (Id. at 72:23-73:7, 74:13-16).  As this

Court previously found with its construction of the Addendum, BSC's construction of

LICENSED PATENTS would also create the absurdity that Dr. Lary gifted the Assigned

Patents, and particularly the '566 Patent.  California law does not permit contract

construction to result in an absurdity.  See Cal. Civ. Code § 1638. This Court finds that

the Assigned Patents were LICENSED PATENTS under the TTA because they fell

within the AGREEMENT FIELD.  The express terms of the TTA provide that the TTA

terminates upon "the expiration of the last to expire of the LICENSED PATENTS."  TTA

§ 12.02.  Since the '566 Patent is the last LICENSED PATENT to expire and it is due to

expire on December 4, 2023, the TTA terminates on December 4, 2023.  BSC's

obligation to pay royalties to the plaintiffs under the TTA continues until 2023.   The

plaintiffs are entitled to partial summary judgment in their favor as to Count IV.  Thus,

the Plaintiffs' Motion for Partial Summary Judgment on Count IV of Second Amended

Complaint and Memorandum of Law (DE# 164, 6/5/13) is GRANTED.

## II.     BSC Is Not Entitled to Summary Judgment as to Counts IV and V Because the TTA Expires on December 4, 2023.

Having determined that the plaintiffs are entitled to judgment in their favor on

Count IV, BSC's Motion for Partial Summary Judgment is DENIED in part as to Counts

IV and V.  See Section I above.  BSC's Motion for Partial Summary Judgment as to the

alternative termination date based on the Canadian Patent No. 2115468 (referred to by

the parties as the "Canadian '468 Patent") in Count V which was due to expire on

February 11, 2014 is denied as moot.

### III.    BSC Is Entitled to Partial Summary Judgment as to Count I regarding Royalties for ANCILLARY PRODUCTS.

BSC's seeks partial summary judgment on Count I of the Second Amended Complaint ("SAC"), wherein the plaintiffs allege a breach of contract claim against BSC for underpayment of the 2% royalty payment due under the TTA purportedly due to BSC's improper exclusion of certain ANCILLARY PRODUCTS from the Royalty Base. Pls.' SAC, Count I (DE# 83, 7/5/12) The plaintiffs claim that BSC's payments of royalties have been limited to "Cutting Balloon Catheters," thereby improperly excluding from the royalty calculation other products sold by BSC which are covered by the TTA's definition of ANCILLARY PRODUCTS (referred to as the "Excluded Ancillary Products") (Id. ¶ 69) The plaintiffs assert that the underpayment of royalties on the Excluded Ancillary Products occurred from 1996 through the termination of the TTA on June 12, 2012.  (Id. ¶ 70) BSC argues that "the allegedly Excluded Ancillary Products, i.e. vascular access needles, introducer sheaths, angiographic guide wires, guide catheters, coronary guide wires, and stents, do not employ or result from the practice of the Barath patent or any other technology or know how pertaining to devices useful for the concomitant longitudinal incision of plaque and radial dilatation of arteries"  under the TTA.  (BSC's Motion at 5-6)  BSC also maintains that the plaintiffs have no credible response to BSC' observation that the TTA has no provision for collecting data needed to calculate royalties on the allegedly Excluded Ancillary Products.

In their opposition, the plaintiffs argue that the definition of ANCILLARY PRODUCTS necessarily and unambiguously covers more products than Cutting

Balloons.  (Pls.' Opposition at 2)(DE# 184-1, 6/26/13) The plaintiffs further argue

because the Cutting Balloon falls within the AGREEMENT FIELD, the ANCILLARY

PRODUCTS definition can be restated as: 3.02 ANCILLARY PRODUCTS ... means

any and all products (including processes) <u>which employ or result from the practice</u> of

[the Cutting Balloon invention]." (<u>Id.</u>) Next, the plaintiffs argue that if this Court finds

ANCILLARY PRODUCTS to be ambiguous, the TTA should be construed against BSC

as the successor-in-interest to the drafter, IVT.  However, under California law, the

Court may not resort to construing the contract against the drafter until it has failed to

resolve an ambiguity employing the other provisions in the California Civil Code.   Cal.

Civ. Code § 1654 (The rule only applies "[i]n cases of uncertainty not removed by the

preceding rules" of construction in the California Civil Code.); <u>Oceanside 84, Ltd. V. Fid.</u>

<u>Fed. Bank</u>, 56 Cal. App. 4th 1441, 1448 (Cal. Ct. App. 1997). The plaintiffs further

contend that the provision should be construed in the manner most favorable to them

because the provision was made for Dr. Lary's benefit.  <u>Citizens for Goleta Valley v. HT</u>

<u>Santa Barbara</u>, 117 Cal. App. 4th 1073, 1077 (2004) (resolving contract construction by

interpreting the language to protect the "reasonable expectations" of the parties and to

avoid absurd results without resorting to construing it against the drafter); <u>see</u> Cal.

Code Civ. P. §1864 ("... when different constructions of a provision are otherwise

equally proper, that is to be taken which is most favorable to the party in whose favor

the provision was made").   The plaintiffs rely on Sections 1684 and 1864 of the

California Civil Code.  Finally, the plaintiffs contend that the extrinsic evidence presents

a fact question on the issue of Dr. Lary's actual knowledge regarding the scope of the

royalty payments on the ANCILLARY PRODUCTS.  However, the plaintiffs did not

present any evidence of Dr. Lary's intent in their opposition that would satisfy their burden in opposing BSC's motion as to Count I.  See Garmon v. Vilsack, 820 F. Supp. 2d 1357, 1361 (S.D. 2011) ("Once the moving party discharges its initial burden," the "non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial."); see also, S.D. Fla. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record).

BSC argues that the plaintiffs attempt to re-write the TTA's ANCILLARY PRODUCTS definition by inserting the "Cutting Balloon invention" into the AGREEMENT FIELD definition: "any and all products ... which employ or result from the practice of [Cutting Balloon invention]."  BSC maintains that the plaintiffs' construction of ANCILLARY PRODUCTS in the TTA does not support their underpayment of royalties claim in Count I because "none of the allegedly Excluded Ancillary Products–each of which can be and is used in procedures that do not involve Cutting Balloons (*see* BSC ex. 19 [Moak Responsive Report] at ¶ 6] – can be said to 'employ or result from the practice of Cutting Balloon invention."  (BSC Reply at 4) (DE# 197, 7/17/13). BSC argues that it is entitled to summary judgment on Count I because the ANCILLARY PRODUCTS definition of the TTA is unambiguous and under California law the Court is required to interpret the contract to give meaning to all provisions. (BSC Motion at 6) (citing Dore v. Arnold Worldwide, Inc., 139 P.3d 56,60-61 (Cal. 2006) (holding that summary judgment was appropriate where the language of the

employment contract was "reasonably susceptible" to only one party's interpretation) (other citations omitted) (DE# 171, 6/6/13) (filed under seal)

Additionally, BSC asserts that the uncontroverted extrinsic evidence precludes the plaintiffs' claim in Count I.  Mr. Radisch testified at his deposition that even though IVT had commercialized stents, guide wires, and other products during his tenure, Cutting Balloons were the only products on which Dr. Lary was entitled to royalties. (BSC's SMF ¶¶ 12,14) Neil Nydegger, IVT's outside counsel who drafted the TTA, testified in response to questioning by the plaintiffs' counsel:

> Q:    [I]f it were shown that a guide wire for guiding the cutting balloon catheter to the point of the lesion was a required product in the procedure that the cutting balloon would be used in, would that – would not the guide wire be covered as an ancillary product using the ordinary words that you gave?
>
> A:    No.

(BSC's SMF ¶ 13) (Nydegger Deposition) Messrs. Radisch and Nydegger are the two witnesses having personal knowledge regarding the negotiations of and the terms of the TTA.   The plaintiffs, however, point out that on the same page of the deposition transcript Mr. Nydegger acknowledges that reasonable people could differ as to whether a guide wire comes within the definition of ancillary product.  (Pls.' Opposition at 5) (DE# 184-1, 6/26/13) (citing Nydegger Deposition 37:10-13; Facts ¶ 42)  The parties course of dealing  is further evidence that royalties would be paid only on Cutting Balloons.  It is undisputed that, even before BSC acquired IVT, IVT manufactured and sold products besides Cutting Balloons, such as guide wires and stents.  (Id. ¶ 14)   In a letter dated March 28, 1994 to Dr. Lary, which enclosed his first royalty statement, IVT wrote: "Please note that July 1993 was the first sale of ***Ancillary Products, namely the Barath Surgical Dilation Balloon***." (Id.); (BSC's Motion at

8(<u>citing</u> BSC's SMF ¶ 20) (emphasis supplied by BSC) Similarly, in 2003, BSC sent Dr. Lary a statement confirming that his royalties were based only on Cutting Balloon sales. (<u>Id.</u>)  Although in 2004 BSC's share of the market for drug eluting stents rose as high as 70%, Dr. Lary's royalty payments decreased in that same year.  (<u>Id.</u> ¶ 21) BSC posits that "[i]t was not until the trustees of Dr. Lary's family Trust decided to bring suit – after Dr. Lary was diagnosed with dementia and around the time that Dr. Lary was declared incompetent to manage his own affairs (SMF ¶ 37) –  that anyone suggested, contrary to the parties' 17-year course of dealing, that BSC was obligated to pay royalties on any products other than Cutting Balloons.  BSC argues further that "neither IVT nor BSC had any way to know whether and how many IVT or BSC products were used in interventional procedures in which Cutting Balloons were also used." (BSC's Motion at 9) (<u>see</u> BSC's SMF ¶¶ 15-17, 23) BSC contends that the TTA would have included a provision addressing the collection of data regarding, or the calculation of, sales of such Excluded Ancillary Products in light of the computational challenges presented.  (BSC's Motion at 10)

In the Opposition, the plaintiffs point out that "BSC's Motion fails to mention that these two communications are <u>the only two royalty statements</u> among approximately thirty sent to Dr. Lary from 1994-2012 that arguably reference the products subject to BSC's royalty payments.  All of the other statements showing royalty payments simply refer to 'Ancillary Products' or 'Net Sales' without any specific product information whatsoever."  (Pls.' Opposition at 5) (DE# 184-1, 6/26/13)(Facts ¶ 5, 44) Additionally, the plaintiffs contend that Mr. Radisch is unable to attest to Dr. Lary's intent and/or actual knowledge regarding ANCILLARY PRODUCTS.  BSC attacks the plaintiffs

38

reliance on a single letter sent to Dr. Lary in 2003 that indicated payments were based on "primarily the Coronary Cutting Balloon" (DE# 184 at 6-7) as insufficient to meet their burden to present "evidence on which the jury could reasonably find for" the plaintiffs, and to "designate specific facts showing that there is a genuine issue for trial." (BSC's Reply at 5, n. 3) (DE# 17, 7/17/13) (quoting Humphrey v. Napolitano, 847 F. Supp. 2d 1349, 1354 (S.D. Fla. 2012) and Osario v. State Farm Bank, F.S.B., 862 F. Supp. 2d 1336, 1339 (S.D. Fla. 2012)). BSC maintains that the plaintiffs' "scintilla of evidence," which fails to address Dr. Lary's intent, cannot overcome the firsthand testimony and sworn declaration from Mr. Radisch and the documentary evidence submitted by BSC. (BSC's Reply) (Id.) BSC argues that the plaintiffs' reliance on the March 2010 letter from Dr. Lary to BSC – at the same time that Dr. Lary was diagnosed with dementia – to argue that Dr. Lary had no actual knowledge that ANCILLARY PRODUCTS included only Cutting Balloons is unreasonable and unpersuasive because Dr. Lary requested information on both Ancillary Products and Licensed Products, when it is undisputed that Dr. Lary was never paid any royalties on Licensed Products. (Id.)

Other than the letter from Dr. Lary to BSC in 2010, inquiring about ANCILLARY PRODUCTS and LICENSED PRODUCTS, there is no evidence in the record to support the plaintiffs' position that ANCILLARY PRODUCTS included the Excluded Ancillary Products, e.g. guide wires and stents. The Court notes that the TTA's audit provision (Section 6.06) limits BSC's duty to retain records to a period of three years. IVT and BSC paid Dr. Lary royalty payments for approximately 15 years before he questioned the scope of the payments. The extrinsic evidence supports BSC's position that ANCILLARY PRODUCTS do not include guide wires, stents or other Excluded Ancillary

39

Products as the plaintiffs' claim.  Accordingly, Boston Scientific's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (DE# 171, 6/6/13)(filed under seal) is GRANTED in part as to Count I.

## CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that the Plaintiffs' Motion for Partial Summary Judgment on Count IV of Second Amended Complaint and Memorandum of Law (DE# 164, 6/5/13) is GRANTED.  It is further

ORDERED AND ADJUDGED that Boston Scientific's Motion for Partial Summary Judgment with Incorporated Memorandum of Law (DE# 171, 6/6/13)(filed under seal) is GRANTED in part and DENIED in part.  BSC's motion is granted as to Count I, denied as to Count IV, and denied as moot as to Count V.

**DONE AND ORDERED** in chambers in Miami, Florida this 13th day of March, 2014.

JOHN J. O'SULLIVAN
United States Magistrate Judge

Copies to:
Counsel of Record