**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 11-CV-23820-O'SULLIVAN**

**[CONSENT CASE]**

|  |  |
|---|---|
| BANNING LARY, M.D., and KATHERINE LARY, TODD LARY, SCOTT LARY, DIANE LARY AND ELIZABETH LARY as Successor Trustees of the STARBRIGHT GRANTOR FAMILY TRUST, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) |
| Defendants. | ) |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

THIS MATTER comes before the Court following a bench trial held on October 6, 2014. The parties consented to trial before a United States Magistrate Judge.  (DE# 261, 10/7/13).  This matter was referred to the undersigned by the Honorable Joan A. Lenard in accordance with 28 U.S.C. § 636(b).  (DE# 262, 10/7/13).  The Court has reviewed the testimony and exhibits presented at trial and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.  Any proposed finding of fact or conclusion of law that is not included in this document has either been rejected by the Court or is unnecessary to the disposition of this matter.  To the extent that any of these findings of fact constitute conclusions of law, they are adopted as such.  The defendants shall be referred to herein collectively as "BSC."

## I.     FINDING OF FACTS

1.     The Court previously determined that Plaintiffs are entitled to royalty payments on sales of BSC's Cutting Balloon product through 2023 (DE 286) and that Plaintiffs are entitled to a lump-sum payment representing the net present value of such royalties (DE 349).  Prior to trial, the parties, attempting to streamline the remaining issues, entered into a stipulation to the use of BSC's forecasts of Cutting Balloon data through 2023 to project future royalties.  The parties later disputed the meaning and import of that stipulation; Plaintiffs contended that BSC had stipulated away any risk associated with the forecasts, while BSC contended that the forecasts were still subject to risk.  Based on this dispute, I determined that the stipulation was not enforceable, although the parties have agreed to continue to rely on the forecasts themselves. (*See, e.g.*, Tr. at 12:1-4)[1]

2.     On October 6, 2014, a bench trial was conducted on the sole issue of the appropriate discount rate to apply to forecasted royalties of BSC Cutting Balloons through 2023 in order to calculate the net present value of the royalty stream.  BSC presented the testimony of Dr. Alan Moak and Mr. John Bone.  Plaintiffs presented the testimony of Mr. Barry Mukamal. Both parties presented the testimony of Adam Hanna, a Principal Financial Analyst at BSC, by deposition.

### A.     Forecasts Of Cutting Balloons Sales Are Subject To Risk

3.     To provide evidence of the uncertainty and risk present in the interventional cardiology market generally and the Cutting Balloon market specifically, BSC proffered Dr. Alan Moak, a practicing interventional cardiologist with the University of Pennsylvania Health

---

[1] "Tr." refers to the transcript of the October 6, 2014 bench trial, attached hereto as Exhibit A.

System in Philadelphia.  (Tr. at 23:7-11.)[2]  Dr. Moak has been practicing for over thirty years, and has performed as many as 400 cases per year during the course of his career.  (*Id.* at 26:9-11, 19-22.)  Dr. Moak treats patients both with coronary artery disease and peripheral artery disease. (*Id.* at 25:19-26:2.)

4.      Dr. Moak described the "tremendous technological advances" that have occurred in the field of interventional cardiology since the late 1970s.  (*Id.* at 25:1-10.)  He explained the evolution of medical devices to treat coronary artery disease, including conventional angioplasty balloons, the introduction of "bare metal" stents in the early 1990s, and the advent of drug-eluting stents beginning in 2003.  (*Id.* at 27:4-28:6.)

5.      Dr. Moak explained that this "explosion of technology" was directed, in part, to devices to reduce restenosis (a process in which a blockage has been dilated, but the blockage reoccurs), and included atherectomy devices and "specialized balloons," such as cutting balloons, scoring balloons, and thermal balloons.  (*Id.* at 36:2-8.)  Physicians found that these devices did not markedly improve the rates of restenosis (generally around 35%) until bare-metal stents were introduced, which "reduced the incidence of restenosis considerably versus all of these other mechanical devices that had been developed."  (*Id.* at 37:3-6.)  Drug-eluting stents further reduced the risk of in-stent restenosis, and were "very, very effective," with the rate of in-stent restenosis reduced to "the low single digits," which was a "complete game-changer."  (*Id.* at 42:9-12.)

6.      Dr. Moak has used Cutting Balloons since the early 2000s.  (*Id.* at 45:1-7.)  While an early study comparing the efficacy of the cutting balloon to conventional balloons "looked positive" (*id.* at 50:2-5), a later global randomized trial "showed absolutely no benefit.  The

---

[2]  Plaintiffs moved *in limine* to exclude the opinions of Dr. Moak (filed under seal July 26, 2014).  On August 28, 2014, I denied their motion.  (DE 349.)

numbers were almost identical.  So acute results were the same.  Restenosis rates were the same." (*Id.* at 50:12-14.)  However, "[c]omplications were higher with cutting balloon angioplasty." (*Id.* at 50:14-15.)  Dr. Moak testified that, while the results of the global randomized trial were not "the death knell for cutting balloons," the results "relegated [the cutting balloon], in most people's minds, to a niche device used for selected applications rather than for general treatment of coronary blockages." (*Id.* at 50:16-20.)

       7.     Dr. Moak further described this "niche" market for the Cutting Balloon— treatment of certain instances of in-stent restenosis:

> [T]he American College of Cardiology and the American Heart Association guidelines for the use of cutting balloons in the United States very simply are that it—with a weak indication, is a device that may be of benefit in selected people to prevent slippage of a balloon when stretching a restenosis in a side branch or in a stent.  But application for general use as a device in the coronary arteries is considered a Class III indication, which means not effective and may cause harm and it's not recommended in the United States for use.

(*Id.* at 50:21-51:6; *see id.* at 59:12-14 ("the cutting balloon in the coronaries and in the periphery in my hands is now a niche device with very infrequent use").)

       8.     Dr. Moak also noted that the rates of in-stent restenosis may be impacted by two "upgraded" emerging technologies—bioresorbable stents and drug-coated balloons, which he described as "game-changers" that "may well revolutionize what we do in the coronary arteries." (*Id.* at 42:13-43:17.)

       9.     The main competing device to the Cutting Balloon is the AngioSculpt balloon, which also encompasses "cutting" or "scoring" technology.  Dr. Moak testified that AngioSculpt "is another ingenious device that has a similar catheter, a similar tip-mounted balloon" and "a spiraling metal edge." (*Id.* at 53:3-10.)  "The second-generation AngioSculpt is far more deliverable.  It's slicker.  It's more flexible.  It's more deliverable.  We can get it to the lesion and more frequently inflate it within the lesion." (*Id.* at 54:3-6.)  Dr. Moak estimated that in his

hospital, AngioSculpt "has corralled more than 80 percent of cutting balloon technology in the market." (*Id.* at 54:9-10; *id.* at 59:22 ("[E]verything is AngioSculpt right now.").)

      10.     Dr. Moak also explained the potential impact of upcoming trials of the AngioSculpt device: "If AngioSculpt balloon trials turn out to be positive, it will have a major negative impact on the Boston Scientific device—or sales. (*Id.* at 65:4-7.) Dr. Moak cautioned, however, that any impact is "unpredictable." (*Id.*)

      11.     Dr. Moak described the medical device industry as a "moving target" and "constantly changing:"

> [W]hat I have seen in the past 30 years in this field is that everything is constantly changing. . . . We're trying to deliver better, safer, and less-invasive treatments to our patients for the benefit of the patients. The predictability of when new technologies will come along and will replace devices that are already out there and established, what we call conventional technologies, it's not predictable.

(*Id.* at 54:22-55:10.)

      12.     Plaintiffs did not offer an interventional cardiology expert or any other evidence to rebut Dr. Moak's testimony.

      13.     Accordingly, the Court finds that any forecast of the demand for BSC's Cutting Balloons is subject to risk and uncertainty. The interventional cardiology market in general has historically been impacted by significant and unpredictable technological change, including the development of new devices—some of which have been unsuccessful, while others have largely supplanted older technologies. The Cutting Balloon itself has been relegated to a narrow market niche—the treatment of in-stent restenosis—due to disappointing clinical results. That niche may be further eroded by new devices currently in development. The Cutting Balloon also faces meaningful competition from the AngioSculpt device; the strength of that competition may depend on future clinical results.

**B.     BSC's Forecasts Of Cutting Balloon Sales Are Not Adjusted For Risk**

14.     BSC forecasted Interventional Cardiology ("IC") world-wide Cutting Balloon sales and commissions through 2023.  The forecasted net sales (revenues less commissions) for the period was $538 million.  The forecast was first prepared in 2013 (later updated in 2014) and included sales of "legacy" IC Cutting Balloons as well as a next-generation Cutting Balloon known as "Flextome Plus."  (Tr. at 107:16-25.)  Applying the contractual 2% royalty to those sales yields $10.8 million in IC forecasted royalties.  (*Id.* at 106:14-107:4; BSX A [Bone Demonstratives] at 6.)

15.     For Peripheral Intervention ("PI") Cutting Balloons, the forecasts were not prepared in the normal course of business (as IC), but were generated specifically for this litigation.  The same methodology was used to determine forecasted royalties for PI as for IC, that is, forecasted commissions were deducted from forecasted gross sales to yield a forecasted PI royalty amount of $5.8 million.  (Tr. at 108:2-13; BSX A [Bone Demonstratives] at 7.)

16.     The forecasted sales of IC Cutting Balloons contained within the R&D Investment Financial Model did not include any adjustment for potential projection error. (Tr. at 79:5-12; *id.* at 95:15-20 [Hanna] ("Q.  When you do these sales forecasts for future sales, is there a protocol where the numbers are adjusted in the future based on any error rate that might come up in the future that is plus or minus a certain percentage or do they reflect your best estimate of what the actual numbers will be at that time?  A.  They reflect our best estimate.").) Plaintiffs provided no evidence to the contrary.  Nor was any evidence presented of any risk-adjustment incorporated into the PI Cutting Balloon forecasts.

17.     Accordingly, the Court finds that the forecasts of Cutting Balloon sales that the parties have agreed to use in their calculation of future royalties did not include any adjustment for projection risk.

### C.    A Discount Rate Of Eleven Percent Is Appropriate

18.    BSC was the only party to present evidence of a risk-adjusted discount rate associated with future sales of Cutting Balloons.  Plaintiffs' expert, Barry Mukamal, did not propose any risk-adjusted discount rate.  (Tr. at 253:20-23.)

19.    Specifically, BSC proffered the testimony of John Bone on the discount rate to be applied to the forecasted future royalties.  Mr. Bone is a managing director of Stout Risius Ross (SRR), a financial advisory firm, and runs SRR's disputes and forensics practice.  (Tr. at 102:7-13.)  He has been consulting for over 25 years, primarily on damages issues, and focuses in large part on intellectual property matters, and has significant experience quantifying and analyzing royalty streams for medical devices.  (*Id.* at 102:20-103:17.)  He is a certified public accountant and certified in financial forensics.  (*Id.* at 103:24-104:1.)   For the purposes of his analysis, Mr. Bone considered five general categories of information, including (1) Plaintiffs' experts' reports (and every document those experts considered); (2) deposition transcripts of fact and 30(b)(6) witnesses; (3) public research; (4) BSC's documents; and (5) discussions with BSC personnel. (*Id.* at 105:15-106:6.)

20.    Both parties' experts agreed that professional judgment—not merely the application of any formula—is required in determining an appropriate discount rate.  (Tr. at 114:2-4 [Bone] ("The determination of a discount rate is not an exact science.  It requires a degree of professional judgment.  And there's no formula to go find an appropriate discount rate."); *id.* at 244:8-12 [Mukamal] ("Q.  And you would, in fact, agree that the selection of an appropriate discount rate is based upon judgment and not merely upon a formula.  Is that right? A.  It's not merely based on a formula.  A formula could be a starting point, but it's certainly not the end point."); *id.* at 244:22-24 [Mukamal] ("Q.  And you cannot apply a formula to arrive at a discount rate.  A.  Well, you can.  It would likely be incorrect.").)

21.     In reaching his opinion that a discount rate of no less than 11% is appropriate, Mr.
Bone relied on the following four bases: (1) the discount rate BSC used in its normal course of
business; (2) the manner in which BSC determined that discount rate (*i.e.*, BSC's "Risk
Assessment Matrix"); (3) Mr. Mukamal's "build-up" method; and (4) BSC's weighted average
cost of capital ("WACC").  (*Id.* at 112:23-113:24.)

### 1.     The Discount Rate Used By BSC In The Normal Course Of Its Business

22.     BSC generated a "R&D Investment Financial Model" for a next-generation
Cutting Balloon product internally referred to as "Flextome Plus."  (BSX 11.)  The Flextome
Plus model was prepared by Adam Hanna, BSC's Principal Financial Analyst for Interventional
Cardiology, whose primary responsibilities include financial reporting results, financial
modeling for investment decisions, and overall analysis of BSC's IC "core" business, which
includes Cutting Balloons.  (Tr. at 73:23-74:5; 75:13-16; 78:2-4.)

23.     The 11% discount rate utilized by BSC in conjunction with Flextome Plus was a
"Risk-Adjusted Discount Rate" (*id.* at 74:25-75:8), that included commercial risks, technical
risks, and regulatory risks.  (*Id.* at 75:21-76:7.)  It also includes "the cost of debt . . . and the cost
of equity," which are underlying components, and the time value of money.  (*Id.* at 76:8-18.)
BSC also forecasted sales of just "legacy" Cutting Balloons, assuming no introduction of
Flextome Plus, in which they also applied the same 11% discount rate.  (*Id.* at 115:9-20; *see* BSX
11 at "(B) Without Project DCF Tab".)

24.     While recognizing that there may be higher risks associated with introducing a
new product, Mr. Bone testified that "there is risk associated with existing products," and "it's a
matter of degree whether . . . there's a high degree of risk or a low degree of risk with respect to
the new products that are being introduced relative to the existing product."  (Trial Tr. at 116:4-

9; *see id.* at 91:1-4 (Mr. Hanna testified that "[o]bviously, there's risks in existing products. We're required to file with the FDA on existing products and prove that they still work. So there's always some level of risk to a product.").)

25.     Mr. Bone explained four reasons why it was reasonable to use 11% for both legacy and next-generation Cutting Balloons. *First*, Flextome Plus "required minimal changes to the cutting balloon themselves. So from a technological standpoint, it didn't require a lot of major changes." (*Id.* at 116:22-25.) *Second*, no clinical trials were necessary for Flextome Plus. (*Id.* at 117:1-2.) *Third*, Flextome Plus was based on proven production and manufacturing methods. (*Id.* at 117:2-3.) *Fourth*, Flextome Plus would be sold through BSC's established distribution and sales networks. (*Id.* at 117:3-4.) All together, "BSC believed that the Flextome+ product had a low enough risk that would be equivalent to the risk that is associated with Legacy products." (*Id.* at 117:5-7.)

### 2.     BSC's Risk Assessment Matrix

26.     The R&D Investment Model for Flextome Plus included a "Risk Assessment Matrix" to determine a discount rate to apply to the future cash flow generated by the forecasted sales and costs. The "Risk Assessment Matrix" was developed by BSC's Portfolio Management Group and is used by all BSC divisions for R&D projects. (Tr. at 80:14-16.) The matrix is a "tool to ensure consistency and to make sure that the appropriate discount rates are used throughout the organization when [BSC is preparing] their financial models." (*Id.* at 117:22-24.)

27.     For Flextome Plus, Mr. Hanna assessed a "one," the lowest possible "Risk Component Score," to each of three risks—Commercial, Clinical/Regulatory, and Technical for a total of three. (*Id.* at 77:16-23; BSX 11 at "Risk Assessment Tab".) Mr. Hanna then utilized the accompanying discount rate table (also developed by BSC's Portfolio Management Group) that generated a discount rate of 11%. (Tr. at 77:24-78:1; BSX 11 at "Risk Assessment Tab".)

28.     The R&D Investment Model for Flextome Plus was presented to BSC senior management in early 2014 (*i.e.*, Kevin Ballinger, President of BSC's Interventional Cardiology division), and the project was approved for full-scale development for a projected 2016 launch. (Tr. at 89:21-90:10; 99:3-6.)

29.     With respect to the Risk Assessment Matrix, I find that it is not unusual that BSC would apply the same discount rate to different risk scores (*e.g.*, a 15% discount rate would apply to a risk score of 4, 5, or 6).  Mr. Bone explained that the matrix is "a management tool. There's a degree of professional judgment in arriving at a discount rate.  There's nothing that requires it to be absolutely linear.  It's a matter of precision." (*Id.* at 119:23-120-2.)  Mr. Bone elaborated by explaining that the relationship between risk and the discount rate is "not necessarily linear.  Determining a discount rate, there's no formula that says it has to be linear or curvilinear. . . .   And it can be sort of lockstep.  It can be a step function . . . .  [I]t's not inconsistent if you have two low-risk projects.  While one is slightly more risky or more risky than the other, they're both in the grand scheme of low risk, that they would have the same discount rate." (*Id.* at 196:7-18.)

30.     Nor do I find that it is necessary to break the 11% down into individual components.  Mr. Bone explained that a "build-up" method (in which each component is separately determined) is not the only method for placing a value on a product (or, in this case, a discount rate on a future cash flow):

> One way to do that is to identify all the component parts, cost it out, add a profit margin, and then you have the selling price.  So that's one acceptable way to do it. Another perfectly acceptable way of valuing a product is to identify a product that's just like it, has all the features, and then you look to see what the product sells for. That's a market-based approach. . . .  [W]hen you're talking about discount rates, it's perfectly acceptable to look at market rates and . . . it doesn't require a buildup.

10

(*Id.* at 122:23-123:10.)  It would be possible to parse out, however, a risk-free rate or BSC's WACC through public sources like Bloomberg.  (*Id.* at 122:6-12.)

31.     Although, as Mr. Bone acknowledged, the cash flows in the R&D Investment Model (gross revenues minus cost of goods sold and operating expenses) is somewhat different from that here (gross revenue less commissions) (Tr. at 124:9-18), that difference is immaterial. The primary risk associated with both cash flows is the achievement of gross revenue—*i.e.*, the "top-line" of each cash flow.  (*Id.* at 124:22-125:4.)

32.     In the R&D Investment Model, Adam Hanna prepared a "Tornado Sensitivities" analysis, which demonstrates "[h]ow the NPV [Net Present Value] changes if a base assumption is different than what we expect."  (*Id.* at 93:23-25; 94:12-14 ("The scale corresponds to the change in NPV if the stated change were to occur from the base model."); *see* BSX 13 at BSC-LARY008975.)  In describing BSC's "Tornado Sensitivities," Mr. Bone pointed out that the largest variability (*i.e.*, risk) was present in market share and average selling price, both of which affect revenue.  (Tr. at 125:25-126:7.)

33.     Mr. Bone also explained that, "while costs are part of the project cash flows, they are small in comparison.  And so, to the extent they fluctuate, they're not as material.  And that is proven out when you look at the tornado analysis.  The primary risk is in the ability to achieve the revenues, which would affect both the royalty stream and the project cash flow."  (*Id.* at 174:11-17.)

34.     Although there's no planned introduction for a next-generation PI Cutting Balloon (in which a Risk Assessment Matrix would be utilized), Mr. Bone explained that, when Mr. Hanna performed the analysis on IC Cutting Balloons, the same 11% discount rate was used for both new products as well as legacy products, and it is reasonable to conclude that BSC likely

would have applied the same 11% to PI Cutting Balloons.  (*Id*. at 126:25-127:12.)  Mr. Bone also pointed out that Plaintiffs' expert Barry Mukamal used the same discount rate for both IC and PI Cutting Balloons in his 2013 report.  (*Id*. at 127:13-17.)

35.     Mr. Bone explained that using the same discount rate for both IC and PI Cutting Balloons is not unreasonable when "[t]here's probably more risk associated with projections that are prepared for litigation [*i.e.*, PI Cutting Balloons] as opposed to in the normal course of business when they're vetted through management [*i.e.*, IC Cutting Balloons]."  Thus, if anything, "the risk for PI could actually be higher than . . . the rate for IC."  (*Id*. at 127:23-128:3.)

### 3.     Mr. Mukamal's "Build-Up Method"

36.     In his Initial Report submitted in 2013, Mr. Mukamal used a "build-up" methodology to calculate discount rates for both IC and PI Cutting Balloons for two time periods—2012-2017 and 2018-2023.  (Tr. at 129:16-130:12.)  For the period 2012-17, Mr. Mukamal relied on a BSC-prepared forecast for IC Cutting Balloons.  (*Id*.)

37.     In his 2013 report, Mukamal considered a number of risk factors that indicated increased risk, such as a potential forecasting error contained in BSC's sales projections.  (*Id*. at 238:6-10.)  He also considered the risk of projecting sales in international markets that were not fully developed, and the specific risks associated with product sales, the projections, and BSC specifically.  (*Id*. at 239:7-10; 239:18-23.)

38.     Relying on BSC's own forecast for ***domestic*** IC Cutting Balloons ***through*** 2017, Mr. Mukamal opined that an appropriate discount rate to apply to that cash flow was 11%.  (*Id*. at 129:25-130:1.)  He applied the same 11% discount rate to domestic PI Cutting Balloons through 2017.  (*Id*. at 132:8-12.)  Thus, for the only period in which Mr. Mukamal relied solely on BSC's IC Cutting Balloon forecast, he used 11% for both IC and PI Cutting Balloons.

39.     For *domestic* projected sales *after* 2017, Mr. Mukamal applied an additional risk premium to account for additional sales projection risk.  (*Id.* at 240:4-7.)  He increased the discount rate from 11% to 13% for domestic IC and PI Cutting Balloons to account for this additional risk.  (*Id.* at 130:1-3.)  Again, he used the same 13% discount rate both for IC and PI Cutting Balloons.  (*Id.* at 132:8-12.)

40.     For *international* IC and PI Cutting Balloon sales *through* 2017, Mr. Mukamal opined that a 13% discount rate was appropriate.  For *international* IC and PI Cutting Balloon sales *after* 2017, Mr. Mukamal opined that a 15% discount rate was appropriate.  (*Id.* at 132:1-3.)

41.     In response to Mr. Mukamal's Initial Report, Mr. Bone "did a thorough analysis" of Mr. Mukamal's build-up method, in which he identified "principally a major mathematical error" in Mr. Mukamal's calculation in weighting BSC's debt.  (*Id.* at 134:2-6.)  Mr. Bone also criticized Mr. Mukamal's failure to consider the 24% discount rate considered by David Bohlman, a valuation professional retained by Plaintiffs to value the royalty stream for estate planning purposes.  (*Id.* at 134:7-20; *see* BSX 1 at STA004497 ("In this particular case, I must consider the risk factors that would be relevant to a hypothetical investor in the Trust.  The medical products market is fraught with constant problems of quality control, undiscovered defects, and unexpected developments in the use of the equipment.  In addition, projections of future cash flow can only be an approximation based on the best information available.").)

42.     Mr. Mukamal amended his report to correct the mathematical error identified by Mr. Bone, which he characterized as a "misplaced cell reference," and recalculated his proffered discount rates.  (Trial Tr. at 242:18-25.)  If he applied this "strict formula" approach, the discount rate for domestic sales through 2017 would have increased from 11% to 12%, the rate for

domestic sales after 2017 would have increased from 13% to 15%, the rate for international sales

through 2017 would have increased from 13% to 15%, and the rate for international sales after

2017 would increased from 15% to 17%, resulting in a net decrease in damages of $731,851.

(*Id.* at 243:1-244:1.)  Mr. Mukamal did not, however, change his opinions to these higher

discount rates, and instead asserted that his original discount rates of 11% and 13% were

appropriate.  (*Id.* at 135:23-136:10.)

     43.     For the purposes of determining an appropriate discount rate in this case, the

AICPA guidelines that distinguish between a "forecast" and a "projections" are not applicable.

As Mr. Bone testified, "the distinction is not meaningful" between the two terms, and both he

and Mr. Mukamal (at least in Mr. Mukamal's 2013 Reports) used the two terms interchangeably,

as did BSC.  (*Id.* at 136:17-137:5.)

### 4.     BSC's Weighted Average Cost Of Capital (WACC)

     44.     WACC is the average cost of the debt (what a company has to pay a bank or

bondholders in terms of interest) and cost of the equity (the expected return that an investor

would want based on the riskiness of the business).  Each form of capital has a cost, and the

WACC is merely the average.  (Tr. at 111:2-18.)  WACC is "generally a formulaic approach," to

a discount rate, but "there are components within WACC that require a degree of professional

judgment and subjectivity."  (*Id.* at 112:12-14.)

     45.     BSC's WACC as of March 31, 2014 was 9.8% according to Bloomberg.  (*Id.*

at 142:11-12.)  Mr. Bone testified that "[t]he 11 percent [proposed discount rate] for a low-risk

project is just slightly above BSC's weighted average cost of capital."  (*Id.* at 121:12-14.)

     46.     Mr. Bone justified the higher discount rate (11%) by explaining that "WACC is

for a diversified company.  What we're looking at here would be the discount rate applied to a

single project."  (*Id.* at 121:16-18.)  He further elaborated:

> A helpful analogy to use here is to think of a stock investment.  So if you have a single stock, there's a certain amount of variability.  However, the more stocks you add, you diversify the portfolio, less risk.  And what we're talking about here is risk.

(*Id.* at 142:22-143:1; *id.* at 121:7-11 ("[W]hen you're . . . determining a discount rate for a single product . . . it lacks diversification.  It's a single product.  Whereas . . . if you looked at a portfolio of products, you have the benefit of diversification.").

47.     For the reasons discussed below, the Court finds that the evidence and methodology cited by Mr. Bone are sufficiently reliable to meet the standards for admissibility of expert opinion testimony.  Accordingly, based on the only record evidence regarding a risk-adjusted rate, the Court finds that the appropriate risk adjusted discount rate in this case is 11%.

**D.     Mr. Mukamal's Proffered Opinions On A "Risk-Free" Or "Default-Risk" Discount Rate Do Not Reflect The Risk Associated With Forecasted Royalties**

48.     Plaintiffs' expert, Barry Mukamal, offered an opinion "on the risk-free discount rate applicable to the future stipulated royalties."  (Trial Tr. at 208:23-209:7.)  This opinion was based on an alleged stipulation that the Court has declined to enforce.  (*Id.* at 245:13-246:4.)  The Court therefore declines to adopt Mr. Mukamal's proposed rate because it does not accurately reflect the risk associated with the forecasted royalties.

49.     Mr. Mukamal also offered a "default-risk" discount rate.  (Trial Tr. at 214:14-216:4.)  Default risk, which accounts only for risk that BSC may become insolvent or otherwise unable to pay its obligations, would be incorporated into BSC's weighted average cost of capital, particularly the cost of debt.  (*Id.* at 166:1-3.)  A discount rate that reflects only default risk, and no product-specific risk—namely, the risk that forecasted demand for BSC's Cutting Balloons may not materialize—would not be appropriate to apply to the forecasted royalties.  (*Id.* at 166:17-20.)

II.     **CONCLUSIONS OF LAW**

A.     **The Applicability Of CACI 359**

50.     Plaintiffs contend that a California form jury instruction, CACI 359, requires the application of a risk-free discount rate, such as the rate on U.S. Treasury notes.  The Court concludes that a risk-adjusted discount rate may be applied to a forecast of future damages if, as here, that forecast has not already been adjusted for risk.

51.     CACI 359 provides, in pertinent part:

> To recover for future harm, [plaintiff] must prove that the harm is reasonably certain to occur and must prove the amount of those future damages.  The amount of damages for future harm must be reduced to present cash value.  This is necessary because money received now will, through investment, grow to a larger amount in the future.  [Defendant] must prove the amount by which future damages should be reduced to present value.

> To find present cash value, you must determine the amount of money that, if reasonably invested today, will provide [plaintiff] with the amount of [its] future damages.

52.     CACI 359 requires that prior to any determination of present value, the plaintiff must first prove that the future damages are "***reasonably certain to occur*** and must prove the amount of those future damages."  CACI 359 (emphasis added); *see California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 62 (Cal. Ct. App. 1985) ("It is the generally accepted rule, in order to recover damages projected into the future, that a plaintiff must show ***with reasonable certainty*** that detriment from the breach of contract will accrue to him in the future.") (emphasis added) (citation omitted).

53.     In *In re Magna Cum Latte Inc.*, Bankr. No. 07-31814, 2008 WL 2047937 (Bankr. S.D. Tex. May 9, 2008).  The plaintiff (Magna) advocated that its expert had already accounted for risk in projecting net revenue and, therefore, a risk-free discount rate was appropriate.  The court rejected the risk-free discount rate proffered by Magna's expert and adopted a risk-adjusted

16

discount rate of 15%, finding that "[t]he forecasts we are dealing with are hardly without risk.

They are substantially risky." *Id.* at *14, 18.  Regarding CACI 359, the court held:

> Magna also contends that a risk-free discount rate is required by California's
> pattern jury charge.  ***The Court does not read the jury charge as precluding
> consideration of a risk-adjusted discount rate***.  The charge provides, in part: "To
> find present cash value, you must determine the amount of money, which if
> reasonably invested today, will provide [*name of plaintiff*] with the amount of
> [*his/her/its*] damages."  ***Nothing in that prevision precludes consideration of a
> risk-adjusted discount rate***.

*Id*. at *17 n.20 (emphases added).

54.     California cases involving lost profits (which appear to be the most analogous to

the damages at issue in this case) have also incorporated the risk of achieving future damages

into the discount rate.  *See, e.g.*, *RAF Enters. LLC v. Trident LLC*, No. A098529, 2005 WL

348955, at *16 (Cal. Ct. App. Feb. 14, 2005) (expert valuing lost profits for restaurant used

variable discount rate of 16% that increased to 36% over time, explaining "that his discounting

methodology was relatively conservative . . . in accounting for market risk"); *Dhillon v. Chevron

U.S.A., Inc*., No. A102567 *et al*., 2004 WL 2191317, at *8 (Cal. Ct. App. Sept. 30, 2004)

(plaintiff's expert "derived future cash flow projections based on one percent annual increases to

cash flow over the 10-year life of the business, and discounted all the future cash flow losses to

present value using a discount rate of 15.5 percent").

55.     A risk-free discount rate is appropriate only if risk has already been reflected in

the forecast of future damages.  In *Energy Capital Corp. v. U.S*., 302 F.3d 1314 (Fed. Cir. 2002),

the Federal Circuit noted that a risk-free discount rate may be appropriate when "the calculation

of the anticipated stream of lost profits [was] adjusted for risk ***prior*** to discounting."  *Id.* at 1334

n.9 (emphasis added).  The Federal Circuit explained, however, this approach is only one of two

methods for discounting a hoped-for future income stream:

> According to the first method, the CPA expert (i) estimates the plaintiff's hoped-for income stream (i.e. the anticipated profits); (ii) reduces the value of the hoped-for income stream to account for risks; and (iii) discounts the risk-adjusted income stream to present value using a conservative (relatively low) discount rate. According to the second method, the CPA expert (i) estimates the plaintiff's hoped-for income stream; and (ii) discounts the value of the hoped-for income stream using a risk-adjusted (higher) discount rate.

(*Id.* (citing Robert L. Dunn and Everett P. Harry, *Modeling and Discounting Future Damages*, 193 J. Acct. 49 (Jan. 2002)).

56.     The cases on which Plaintiffs have relied in support of a "risk-free" discount rate are distinguishable because, in those cases, the risk associated with the forecast of future damages was reflected in the forecast itself; thus, the discount rate needed only to account for the "cost of money"—not risk.  In *Kairos Scientific Inc. v. Fish & Richardson*, *P.C.*, No. 415736, 2003 WL 21960687 (Cal. Super. Ct. July 29, 2003), plaintiff's experts applied discount rates ranging from 20% to 25% to their forecasts of future lost profits.  *Id.* at *50 n.295 (Mr. Mowrey applied a 25% discount rate "to account for the risk of business"), *id.* at *52 (Dr. Scotchmer "applied a discount rate of twenty percent (20%) to reflect the risk of uncertainty in these estimates.").  After the judge determined the damages award and requested a hearing on appropriate present value, defendant "presented testimony from [their expert] that the concept of 'present value' included both the 'time-value' of money and the 'risk' that the future income stream may never be realized" and proffered a 35% discount rate.  *Kairos Scientific Inc. v. Fish & Richardson P.C.*, No. A107085, 2006 WL 171921, at *16 (Cal. Ct. App. Jan. 24, 2006).  The trial court struck that testimony because "the hearing was not intended to revisit the issue of the amount of damages and the likelihood of receiving it, issues that have already been considered . . . ."  *Id.* (internal quotations omitted).  The appellate court affirmed, finding that the trial court "expressly stated that it had already considered the risk factors when it determined the amount of damages."  *Id*. at *17.

57.     *Diesel Mach., Inc. v. B.R. Lee Indus., Inc*., 418 F.3d 820 (8th Cir. 2005), also
relied on by Plaintiffs, is similarly consistent with the first *Energy Capital* method pursuant to
which risk is reflected in the calculation of the stream of future damages, followed by a
determination of present value.  In *Diesel*, the lost profits calculation proffered by defendant's
expert had already incorporated the riskiness of achieving the cash flow.  *See* Brief of Appellee
Diesel Mach., Inc., No. 03-2653, (8th Cir. July 6, 2004), *available at* 2004 WL 5354136.
("Burton already reduced DMI's damages due to riskiness, taking full advantage of Instruction
#14 requiring lost profits to be shown with reasonable certainty.")  As the appellees noted, the
"risk-free 'interest rate or return' rate . . . is not triggered until ***after*** the estimate of future lost
profits is determined."  (*Id*. (emphasis added).)

58.     In this case, the parties followed the second approach described in *Energy
Capital—i.e*., as the Court previously found, the projection of future sales on which the parties
based the calculation of royalties due was ***not*** adjusted for any risk of projection error.
Accordingly, consistent with CACI 359 and *In re Magna Cum Latte*, an 11% discount rate—
which reflects both the cost of money and risk—is appropriate.

**B.     Mr. Bone's Opinions Are Admissible Under Rule 702 and *Daubert***

59.     Rather than offer an alternative risk-adjusted discount rate, Plaintiffs have chosen
to rely entirely on their argument that Mr. Bone's opinion regarding the appropriateness of an
11% discount rate fails to meet the standard for reliability of expert testimony and is therefore
inadmissible.  (Tr. at 22:2-22.)  The Court finds, however, that Mr. Bone's opinion meets the
requirements of admissibility under Fed. R. Evid. 702.  Plaintiffs' challenges to Mr. Bone's
testimony go to its weight, which might have been significant if Plaintiffs had proposed an
alternative risk-adjusted discount rate for the Court's consideration.  On the present record,

however, the Court has found that a risk-adjusted rate is appropriate and adopts the 11% rate

proposed by Mr. Bone.

### 1.      Legal Standards

60.      Federal Rule of Evidence 702 allows admission of "scientific, technical, or other

specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the

evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The Court has "wide latitude" in

determining whether to admit expert testimony pursuant to Rule 702, and the inquiry "is a

flexible one."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 594 (1993).  The

Eleventh Circuit has determined that this inquiry examines whether "(1) the expert is qualified to

testify competently regarding the matters he intends to address; (2) the methodology by which

the expert reaches his conclusions is sufficiently reliable . . . and (3) the testimony assists the

trier of fact, through the application of scientific, technical, or specialized expertise, to

understand the evidence or to determine a fact in issue."  *City of Tuscaloosa v. Harcros Chems.,*

*Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589); *see United States*

*v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) ("The rules relating to *Daubert* issues are not

precisely calibrated and must be applied in case-specific evidentiary circumstances that often

defy generalization.").

61.      "Whether the Daubert opinion factors are even pertinent to assessing reliability in

a given case will depend[ ] on the nature of the case, the expert's particular expertise, and the

subject of his testimony."  *Brown*, 415 F.3d at 1268 (citation omitted).  Unless an expert's

testimony is so "fundamentally unreliable that it can offer no assistance to the jury . . . the factual

basis of the testimony goes to the weight of the evidence."  *Larson v. Kempker*, 414 F.3d 936,

940-41 (8th Cir. 2005).  Accordingly, "[v]igorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

62.     *Daubert* "requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony ***does not reach the jury***." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (emphasis added).  "However, because this is a non-jury trial, the gatekeeping purpose of *Daubert* is not implicated." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 616 F. Supp. 2d 1250, 1256 (M.D. Fla. 2009); *see Bristol-Myers Squibb Co. v. Andrx Pharms., Inc.*, 343 F. Supp. 2d 1124, 1131 (S.D. Fla. 2004) ("The Court agrees that the question of reliability and relevance in this case is merely one of degree . . . . This is especially true since this is a bench trial, where the Court must evaluate the evidence regardless of whether it ultimately decides to exclude it. . . . Thus, some courts have held that, in cases where the judge is the factfinder, ***the criteria for finding evidence admissible can be applied less strictly***.") (emphasis added) (internal citations omitted); *see Taubensee Steel & Wire Co. v. Macsteel Int'l USA Corp.*, No. 9 C 1505, 2011 WL 1651239, at *4 (N.D. Ill. May 2, 2011) ("The Court notes that while the *Daubert* standards apply in a bench trial, concerns about the trier of fact being fooled by evidence of dubious merit are lessened when the judge is acting in that role.  The Court is capable of evaluating this evidence and giving it the weight that it deserves.") (internal citations omitted).

63.     As both parties' experts agreed, the determination of a discount rate necessarily involves judgment.  "Present-value determinations are not an exact science; competent experts . . . can adopt highly divergent opinions without being deemed incorrect as a matter of law." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 364-65 (5th Cir. 2003); *see* Robert M. Lloyd, *Discounting Lost Profits in Business Litigation: What Every Lawyer and Judge*

*Needs to Know*, 9 Transactions 9, 63 (2007) ("The choice of a discount rate is not a purely mechanical calculation.  It usually requires a number of subjective judgments, and experts need latitude to make these judgments, subject to cross-examination and criticism by opposing experts."); *Jack Tyler Eng'g Co. v. Colfax Corp.*, No. 10-02373, 2013 WL 1500510, at *3 (W.D. Tenn. Apr. 10, 2013) ("Scott formulated the 6.0% discount rate from source material and subjective judgments based on his expertise.  Whether Scott's discount factor analysis incorrectly excludes additional considerations bears on the weight of his analysis, but not its admissibility.")

64.     Here, based on its evaluation of Mr. Bone's testimony during trial, the Court concludes that Mr. Bone properly exercised his expertise and judgment in arriving at his proffered 11% discount rate.  Mr. Bone is qualified in the relevant fields and his testimony was helpful to the Court in determining an appropriate discount rate.  As discussed below, any deficiencies in Mr. Bone's methodology identified by Plaintiffs go to the weight of Mr. Bone's testimony rather than its admissibility under *Daubert*—particularly given that the case was tried to the Court, not a jury.

## 2.     Mr. Bone's Reliance On BSC's Risk Assessment Matrix Was Appropriate

65.     Mr. Bone's reliance on BSC's Risk Assessment Matrix was appropriate.  Courts in this circuit have routinely allowed expert testimony based on a party's reliable information.  For example, in *Advanced BodyCare Solutions, LLC v. Thione Int'l, Inc.*, 615 F.3d 1352 (11th Cir. 2010), Advanced moved to exclude Thione's expert "because his methodology was to calculate Thione's anticipated profits simply by using projected revenue and cost data provided by Thione without verifying beforehand the accuracy of the projected revenue and the

underlying data" and because "the projected revenue and underlying data were flawed." *Id.*

at 1363.  The Eleventh Circuit rejected that argument:

> We agree with the district court's explanation for denying Advanced's objection
> to Dr. Coston's testimony—Advanced's arguments went not to admissibility but
> to the weight to be attributed to his testimony.  Advanced was free to challenge—
> on cross-examination and on rebuttal—the reliability of the revenue projections
> and data on which Coston grounded his opinions and thus the weight the jury
> should ascribe to those opinions.

*Id.* at 1363-64 (internal quotations omitted).

66.     Similarly, in *Platypus Wear, Inc. v. Clarke Modet & Co.*, No. 06-20796-civ, 2008

WL 4533914 (S.D. Fla. Oct. 7, 2008), defendant sought to exclude plaintiff's expert's testimony

because the expert failed to verify the data in plaintiff's royalty income ledgers.  *Id.* at *3.  The

expert was also criticized for failing to review and analyze all of plaintiff's license agreements

and failed to verify the accuracy of the data he used in another damages calculation.  *Id.*  The

court rejected defendants' challenges to the expert:

> Defendants' main challenge to Mr. Argiz's testimony is his failure to verify the
> accuracy of various data, such as PWI's royalty income ledgers for Big Blue or
> Horizone's forecast sales, before utilizing them in generating his report.  Yet
> contrary to Defendants' assertion, an expert witness is not a private investigator
> hired to investigate the accuracy of each report or document he uses in creating
> his report.  Instead, the documents or data an expert witness utilizes must only be
> "of a type reasonably relied upon by experts in the particular field in forming
> opinions or inferences upon the subject."  Fed. R. Evid. 703.  Surely, a company's
> forecast sales or income ledgers fall under this umbrella.

*Id.* at *5.  The court determined that defendant's arguments "are not enough for the Court to

deem the expert's conclusions inadmissible as a matter of law under Rule 702."  *Id.*  The court

denied defendant's motion to exclude, finding that the expert's reliance on "forecast sales or

income ledgers fall under [the] umbrella" of documents "reasonably relied upon by experts in the

particular field in forming opinions or inferences upon the subject."  *Id.* at (citing Fed. R. Evid.

703).

67.     Courts in other districts have also allowed expert testimony based on a party's reliable information.  In *Taubensee Steel*, the defendant "challenge[d] [the expert's] proposed testimony on the ground that [the expert] did not assess the steel according to an industry standard, but rather used [plaintiff's] own rust level guide."  2011 WL 1651239, at *3.  The court allowed the testimony, finding that "any inconsistencies . . . go to the weight of his opinion, not its admissibility."  *Id.  See CRC Health Grp., Inc. v. Town of Warren*, No. 2:11-cv-196, 2014 WL 2444435, at *28 (D. Me. Apr. 1, 2014) (expert's reliance on plaintiff's profit projections was not unreliable because they were not "speculative projections for an entirely untried business; in this case, the running of methadone clinics was [plaintiff's] business"); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08-C242, 2010 WL 3397358, at *5-6 (N.D. Ill. Aug. 24, 2010) ("Whirlpool also has failed to show that Dr. Rao's use of internal Whirlpool documents rather than conducting his own surveys renders his opinions inadmissible. . . .  Dr. Rao testified at length regarding the Whirlpool documents he reviewed, the factual content of those documents, and the means by which he drew conclusions from those documents.").

68.     Here, BSC's Risk Assessment Matrix was "not generated by [its] counsel or prepared in anticipation of litigation."  *Platypus Wear*, 2008 WL 4533914, at *5; *see Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046-CIV, 2014 WL 2855062, at *6 (S.D. Fla. June 23, 2014) ("Though [the expert's] reliance upon [plaintiff's] own projections again provides fodder for cross-examination, a damages expert's reliance upon data provided by the parties generally does not require exclusion of the resulting opinions.").  The Court therefore concludes that Mr. Bone's partial reliance on BSC's internal information and analysis in creating and applying the matrix did not render his testimony inadmissible.

### 3.      Mr. Bone Conducted An Independent Analysis

69.     Plaintiffs' criticism that Mr. Bone did not independently verify the 11% discount rate utilized in the Risk Assessment Matrix is not supported by the record and, in any event, does not make his opinions unreliable.  In *Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 477-78 (S.D.N.Y. 2010), plaintiffs challenged the expert's valuation and discount rate opinions by asserting, among other things, that the expert's use of a 20% discount rate was unreliable because he could not confirm the rate reflected overall industry practice.  The court allowed the expert to opine, finding that the expert's uncertainty "as to whether the twenty percent discount rate was 'overall industry practice,' does not render his methodology unreliable" because "[i]ndustry standards do not have to be uniform for them to be helpful in educating the jury."  *Id.* at 478.

70.     Plaintiffs' criticism that Mr. Bone did not use the "build-up" method of arriving at a discount rate (which they attest is the proper method) also does not warrant exclusion of his opinions.  *See Adel v. Greensprings of Vt., Inc.*, 363 F. Supp. 2d 683, 689 (D. Vt. 2005) ("Rule 702 and Daubert ***do not require an expert to use the best method available***, they only require that the evidence be relevant and reliable.") (emphasis added).  In any event, Mr. Bone analyzed Mr. Mukamal's build-up method from 2013 and reached an independent conclusion as to the appropriate discount rate based on his pointing out of Mr. Mukamal's errors and subsequent endorsement of the discount rate once the errors were corrected.

71.     As one court noted, "Daubert does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. . . .  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."  *Skye v. Maersk Line Ltd.*, No. 11-21589-CIV, 2012 WL 1252523, at *6 (S.D. Fla. Apr. 13, 2012)

(quoting *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002)); *see Bullock v. Daimler Trucks N. Am., LLC*, No. 08-cv-00491, 2010 WL 3922804, at *2 (D. Colo. Sept. 30, 2010) (proffer of expert testimony "is tested against the standard of reliability, not correctness").  In *Bullock*, the court allowed the opinions of plaintiff's expert despite defendants' argument that the expert "should have engaged in additional analysis to arrive at more accurate conclusions."  *Id.* at *4.  The court explained that "admissibility under Rule 702 does not require perfect methodology" and thus "the fact that [the expert] could have conducted additional calculations does not, by itself, make his methodology unreliable."  *Id.*

72.     The Court concludes that, here, Mr. Bone's use of BSC's internal information and analysis was sufficiently reliable to meet the standard for admissibility under Rule 702.  In any event, the Court notes that Mr. Bone did not rely solely on BSC's internal analysis for his opinion regarding the 11% discount rate; indeed, as Mr. Bone observed, Plaintiffs' own expert, Mr. Mukamal, applied the same discount rate to a similar BSC internal forecast earlier in the case.  Mr. Bone also considered BSC's weighted average cost of capital, as published by an independent source.

## III.   CONCLUSION

73.     The Court finds that the forecasts of Cutting Balloon sales on which the parties' have based projected future royalties through 2023 is subject to considerable risk and uncertainty, which has not been accounted for in the forecasts themselves.  Accordingly, the Court will adopt an 11% risk-adjusted discount rate—the only risk-adjusted rate proposed by either party—to reduce those forecasts to a present value lump-sum.  The parties agreed at trial that application of an 11% discount rate to the agreed royalty stream forecast results in a present

value of $10,400,000.[3]  The parties agreed to the prejudgment interest due on past due royalties, and that such interest should be compounded annually at a rate of 10%.  The prejudgment interest due from June 13, 2012 through October 31, 2014 is $396, 471.  The parties agreed that the per diem rate from November 1, 2014 through the date of judgment is $1,075 per day.

DONE AND ORDERED in Chambers at Miami, Florida this 15<u>th</u> day of December, 2014.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
Counsel of Record

---

[3] The parties filed their Stipulated Additional Facts (DE# 396, 12/12/14) that addresses a calculation error in the amount of Cutting Balloon royalties due to the plaintiffs under the TTA from June 13, 2012 through March 31, 2014. The parties shall submit the recalculated present value based on the stipulated reduced number.